**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: CARDINAL HEALTH, INC.** | : | |
| **ERISA LITIGATION,** | : | |
| | : | **Case No. C2-04-643** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| | : | |
| **THIS DOCUMENT RELATES TO:** | : | **Magistrate Judge King** |
| **All ERISA Actions** | : | |

**OPINION AND ORDER**

<u>INDEX</u>

I. INTRODUCTION & SUMMARY.................................................................... 1

II. BACKGROUND.......................................................................................... 3

III. STANDARD OF REVIEW........................................................................ 12
   A. Motion to Dismiss................................................................................. 12
   B. ERISA Pleading Requirements.............................................................. 13

IV. ANALYSIS............................................................................................... 14
   A. ERISA Background & the Statutory Framework of ERISA .................... 14
     1. ERISA Fiduciaries.............................................................................. 15
       a. Fiduciary Duties Under ERISA........................................................ 16
         i. Loyalty................................................................................... 18
           (a) "Two Hat" Doctrine.................................... 19
           (b) One Hat at a Time..................................... 20
         ii. Prudence............................................................................... 21
         iii. Diversification....................................................................... 22
         iv. Diversification Exceptions...................................................... 23
         v. Compliance........................................................................... 26
       b. Remedies for Breach......................................................................... 27
   B. Whether Plaintiffs Have Stated a Claim for Relief
     under ERISA § 502(a)(3)........................................................................ 28
   C. Defendants' Various Motions to Dismiss.................................................. 33
     1. Defendants' Fiduciary Obligations....................................................... 33
     2. Whether Plaintiffs Sufficiently Allege
       Defendants' Fiduciary Status............................................................... 36
     3. Count I - Whether Defendant Cardinal, the Committee Defendants,
       The Director Defendants, and Defendant Putnam Breached
       Fiduciary Duties of Loyalty and Prudence................................... 39
       a. Whether the "Abuse of Discretion" Standard Applies
         to this Case........................................................................... 40
       b. Whether Plaintiffs Have Stated a Claim Under the
         "Prudent Person" Standard............................................... 46
     4. Count II - Whether Defendant Cardinal, the Committee Defendants,
       And the Director Defendants Breached Their Fiduciary
       Duties by Making Material Misrepresentations and/or by
       Failing to Disclose Material Information..................................... 57
       a. Loss Causation............................................................................... 58
       b. Whether Count II Fails to State a Claim for Relief Because
         It Fails to Show that the Committee Defendants Had Any
         Knowledge of the Alleged Misstatements....................... 62
       c. Actual reliance.............................................................................. 65

i

5. Count III - Whether Plaintiffs Have Sufficiently Alleged that
Defendant Cardinal, the Committee Defendants, and the
Director Defendants Breached Their Fiduciary Duties
To Monitor.................................................................................. 67
a. Cardinal Defendant - Whether Cardinal May be Liable for the
Director Defendants' Actions
Under *Respondeat Superior*........................................... 69
6. Co-Fiduciary Liability........................................................................ 74

V. CONCLUSION............................................................................................. 76

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

IN RE: CARDINAL HEALTH, INC.  :
ERISA LITIGATION,     :
            :  **Case No. C2-04-643**
     **Plaintiff,**  :
            :
   **v.**      :  **JUDGE ALGENON L. MARBLEY**
            :
            :
**THIS DOCUMENT RELATES TO:** :  **Magistrate Judge King**
 **All ERISA Actions**   :

## OPINION AND ORDER

## I.  INTRODUCTION & SUMMARY

  In this consolidated class action, Lead Plaintiffs, David K. McKeehan, James A. Syracuse, and Timothy E. Ferguson (collectively the "Plaintiffs") bring suit on behalf of employees of Cardinal Health, Inc. ("Cardinal" or "the Company") who invested in Cardinal stock through the Company's 401(k) plan.  Plaintiffs allege that the Defendants, certain officers, directors and employees of Cardinal, as well as the Putnam Fiduciary Trust Company ("Putnam"), the former Trustee of Cardinal's 401(k) plan, violated the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq*.

  Plaintiffs allege that from 1998 through 2002, while Cardinal's pharmaceutical distribution unit underwent a reorganization, the corporation and those associated with it disseminated materially false and misleading information in analyst reports, press releases, public statements, and filings with the Securities and Exchange Commission ("SEC").

According to Plaintiffs, over a four-year Class Period, the Company engaged in a series of illegitimate accounting strategies in order to both hide its losses and inflate its reported revenues to meet increasingly unrealistic earnings projections during the pharmaceutical distribution market transition from a "buy and hold" (B+H) model to a "fee for service" ("FFS") model. Plaintiffs assert that Cardinal's accounting manipulations and its purported dissemination of material misrepresentations affected the price of its securities, misled investors as to the Company's "true value," and caused Plaintiffs to lose money that they had invested in Cardinal's 401(k) plan.

Cardinal, the Cardinal Employee Benefits Policy Committee (the "Committee" or "Committee Defendants"), and the Company's Board of Directors ("Director Defendants") filed a joint motion to dismiss Plaintiffs' Complaint under Federal Rules of Civil Procedure 12(b)(6), alleging that Plaintiffs failed to state a claim upon which relief can be granted.  Defendants Putnam and Defendant Richard J. Miller also filed separate motions dismiss Plaintiffs' Complaint under Rules 12(b)(6).

This Court holds that: (1) Plaintiffs failed to state a claim for relief under ERISA § 502(a)(3); (2) the "prudent person" standard and the liberal notice pleading requirements apply to Plaintiffs' claims; (3) Defendant Putnam is a "directed trustee" subject to a different standard from that applied to a traditional Plan fiduciary, and Plaintiffs have failed to state a claim against Putnam under this standard; (4) the *Dura* loss causation requirement applicable in cases of securities fraud  does not apply in the context of an ERISA claim; (5) Defendants' contention that Plaintiffs have failed to show that the Committee Defendants had any knowledge of the alleged misstatements is inappropriate for decision on a motion to dismiss; (6) without deciding whether "Fraud on the Market Theory" is applicable in the context of an ERISA claim, this

Court finds that Plaintiffs have adequately pled reliance under the pleading requirements of Federal Rule of Civil Procedure 8(a); (7) Plaintiffs have sufficiently alleged that Defendant Cardinal, the Committee Defendants, and the Director Defendants breached their fiduciary duties to monitor; (8) *respondeat superior* is applicable to ERISA cases, and Plaintiffs' allegations that Cardinal may be held liable under a theory of *respondeat superior* are sufficient to withstand Defendant's motions to dismiss; (9) Plaintiffs have successfully stated claims that Defendants may be liable as co-fiduciaries.

Defendants' motions are **GRANTED** in part and **DENIED** in part. The following motions are **GRANTED**: (1) Defendants' Motions to Dismiss **Counts I, II,** and **III** brought under ERISA § 502(a)(3) due to Plaintiffs' failure to state a claim for equitable relief; and (2) Defendant Putnam's Motion to Dismiss **Count I**. The following motions are **DENIED**: (1) Defendant Cardinal's Motion to Dismiss **Counts I, II,** and **III**; Director Defendants' Motions to Dismiss **Counts I, II,** and **III**; (3) Committee Defendants' Motion to Dismiss **Counts I, II,** and **III**; and (4) Defendant Richard J. Miller's Motion to Dismiss **Counts I, II,** and **III**.

## II. BACKGROUND[1]

### A. The Plaintiffs and the Putative Class

Lead Plaintiffs, David K. McKeehan, James A. Syracuse, and Timothy E. Ferguson (collectively the "Plaintiffs"), are or were Participants in the Cardinal Health Profit Sharing,

---

[1]The Court takes its facts from the Plaintiffs' Consolidated Amended Complaint (the "Complaint"). Defendants "assume the truth of facts properly alleged in the Complaint" for the purpose of their motion to dismiss only. *See* Certain Defs.' Motion to Dismiss at 4. Based on this same set of facts, certain plaintiffs have also brought a class-action securities fraud case, seeking recovery for anyone who traded Cardinal securities during the Class Period consolidated under the caption *In re Cardinal Health, Inc. Securities Litigation ("Securities Litigation")*.

Retirement and Savings Plan (the "Plan"), which was amended and restated in its entirety,

generally effective as of January 1, 2005, and renamed the Cardinal Health 401(k) Savings Plan,[2]

within the meaning of ERISA § 3(7).[3, 4]  Lead Plaintiffs bring their Complaint on behalf of

themselves and all other Participants for whose individual accounts the Plan purchased and/or

held shares of the Employer Common Stock Fund (the "Fund") at any time from October 24,

---

[2]The Plan also includes all eligible individual account plans which have been merged into
the Cardinal Health 401(k) Savings Plan at times relevant to this Complaint, including but not
limited to 401(k) defined contribution retirement plans of the following employer entities:

> Allegiance Corporation
> Bindley Western Industries, Inc.
> Automatic Liquid Packaging, Inc.
> Pacific Surgical Innovations, Inc.
> Ransdell Surgical, Inc.
> International Processing Corp.
> American Threshold Industries, Inc.
> Premier Pharmacy Services, P.C.
> Beckloff Associates, LLC
> Snowden Pencer, Inc.

*See* Cardinal Health 401(k) Savings Plan, Amended and Restated Effective as of January 1,
2005.

[3]ERISA § 3(7) reads:

(7) The term "participant" means any employee or former employee of an employer, or
any member or former member of an employee organization, who is or may become
eligible to receive a benefit of any type from an employee benefit plan which covers
employees of such employer or members of such organization, or whose beneficiaries
may be eligible to receive any such benefit.

*See* 29 U.S.C. § 1002(7).

[4]Plaintiff David L. McKeehan is a resident of the State of Illinois and was, at all relevant
times, a Participant in the Plan within the meaning of ERISA § 3(7).  Plaintiff James A. Syracuse
is a resident of the State of New York and was, at all relevant times, a Participant in the Plan
within the meaning of ERISA § 3(7).  Finally, Plaintiff Timothy E. Ferguson is a resident of the
State of Florida and was, at all relevant times, a Participant in the Plan within the meaning of
ERISA § 3(7).

2000 through the present (the "Class Period"). Excluded from the Class are Defendants herein, directors of Defendant Cardinal, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

## B. The Defendants

Plaintiffs bring the action against Cardinal, the Committee, and the Director Defendants.[5] The Complaint also names Putnam, the Plan's trustee from the beginning of the Class Period until December 2004, and Richard Miller,[6] Cardinal's former Chief Financial Officer ("CFO") as Defendants.

## C. The Plan

The Plan is an ERISA-regulated "employee benefit plan." The Plan is also a "defined contribution" or "individual account" plan under ERISA § 3(34),[7] meaning that it "provides for

---

[5] The Committee consists of the following individuals: Richard C. Adloff, Paul Williams, Donna Brandin, Anthony J. Rucci, Steven A. Bennett, Carole Watkins, and Susan Nelson (collectively, the "Committee Defendants"). Cardinal's Board of Directors consists of the following individuals: Robert D. Walter, William E. Bindley, Dave Bing, George H. Conrades, John F. Finn, Robert L. Gerbig, John F. Havens, J. Michael Losh, John B. McCoy, Richard C. Notebaert, Michael D. O'Halleran, David W. Raisbeck, Jean G. Spaulding, M.D., and Matthew D. Walter (collectively, the "Director Defendants").

[6] According to the Complaint, Mr. Miller was Cardinal's CFO and Principal Accounting Officer as well as a signatory on the Plan's Form 11-K annual reports during the Class Period. *See* Complaint ¶ 13.

[7] Section 3(34) of ERISA reads:

(34) The term "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

*See* 29 U.S.C. § 1002(34).

5

individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account."[8]  *See* 29 U.S.C. § 1002(34).

According to its terms, the Plan is funded primarily through participant investments and employer matching.  The participants have extensive discretion in allocating their investments

---

[8]There are two broad categories of employee benefit plans: defined benefit plans and defined contribution plans.  SEC Release No. 33-6188, explains the difference:

> A *defined benefit plan* pays fixed or determinable benefits.  The benefits ordinarily are described in a formula which specifies the amount payable in monthly or annual installments to participants who retire at a certain age.  As long as the plan and the employer(s) contributing to the plan remain solvent, and the plan continues to be operated, vested participants will receive the benefits specified.  In the event the investment results of the plan do not meet expectations, the employer(s) usually will be required, on the basis of actuarial computations, to make additional contributions to fund the promised benefits.  Conversely, if the plan earnings are better than anticipated, the employer(s) may be permitted to make contributions that are less than the projected amounts.
>
> A *defined contribution plan* does not pay any fixed or determinable benefits.  Instead, benefits will vary depending on the amount of plan contributions, the investment success of the plan, and allocations made of benefits forfeited by non-vested participants who terminate employment.  Thus, the amount of benefits is based, in part, on the earnings generated by the plan.  Both defined benefit and defined contribution plans can provide for employee contributions.  In addition, defined contribution plans maintain individual accounts for all participating employees.  These accounts reflect each participant's share in the underlying trust assets and are adjusted annually to take into account plan contributions, earnings, and forfeitures.  In contrast, defined benefit plans ordinarily do not maintain individual accounts, except to the extent necessary under the Internal Revenue Code to record benefits attributable to voluntary contributions by employees.
>
> ERISA created the Pension Benefit Guarantee Corporation, which insures minimum pension benefits for defined benefit plans if the employer becomes unable to pay the pension; there is no insurance for the defined benefit contribution plan.  The Plan at issue in this case is a defined benefit contribution plan.

*See In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 870 n. 7 (S.D. Tex. 2004) (citing SEC Release No. 33-6188, 1980 WL 29482, at *6-7 (Feb. 1, 1980)).

among the various alternatives, and they may transfer their investments into or out of the Stock Fund or any other fund whenever it suits them.  *See* Defs.' Ex. C. At 12-14; Defs.' Ex. E. at 4. As for the employers, under the Plan, "any company matching or other employer contributions would be invested in the same funds chosen by the Participant for the Participant's contributions."  *See* Defs.' Ex. E at 4.

Cardinal's voluntary matching contributions vary from time to time.  For instance, in 2004, Cardinal matched each participant's savings with $.50 for every $1 contributed by the participant, up to six percent of the participant's salary.  *See* Defs.' Ex. E at 4.  Currently, Cardinal matches each participant's savings on a "one-to-one" basis, up to 3 percent of the participant's pay, and $.50 for every $1 the participant contributes above three percent to a maximum of 5 percent of his compensation.  *See* Defs.' Ex. D at 6.  The various Summary Plan Descriptions ("SPD") Cardinal distributed during the Class Period provided Plan participants with information regarding their investment options and associated risks to assist them in making their investment decisions.

The Plan indicates that Cardinal is the named administrator, and, as the Plan sponsor, Cardinal appointed (and later removed) Putnam as the Plan Trustee.  Further, the Plan states that "[t]he Company shall have the sole authority to appoint and remove the Trustee and members of the Committee" and "shall have the final responsibility for the administration of the Plan. . . and shall be the 'Plan Administrator' and the named fiduciary."  *See* Defs.' Ex. A § 10.01; Defs.' Ex. B § 10.01.[9]  The Plan designates no other entity or person as a Plan "fiduciary."

---

[9]The Plan gave Cardinal the authority to appoint and/or to remove Putnam as Trustee at any time.  *See* Complaint ¶ 54.

One of the Plan's stated purposes is to "provide Participants with ownership interests in the Company." Defs.' Ex. A. § 8.05; Defs.' Ex. B § 8.05. The Plan specifies that the Trustee is "[a]uthorized to maintain the 'Employer Common Stock Fund' as one of the Investment Funds." *See* 1998 and 2002 Plans § 8.05, App. Ex. Tabs 1 and 2. As such, the Plan mandates that the "Employer Common Stock Fund *shall* consist of stock of the Company and cash or cash equivalents needed to meet obligations of such fund or for the purchase of stock of the Company. . . To the extent practicable, all available assets of the Employer Common Stock Fund shall be used to purchase Shares,[10] which shall be held by the Trustee. . ." *Id*. (emphasis added).

The Plan offers participants several diversified investment options in addition to the Cardinal Stock Fund (the "Stock Fund"). These options change over time. For instance, in January 2001, the Plan investment options increased from eight to twelve funds. *See* Defs.' Ex. C at 25. Currently, ten options are available, including, among others, a "stable value fund, a balanced fund, the Fidelity Diversified International fund, and the PIMCO Total Return Investment Fund (Institutional Class). *See* Defs.' Ex. D at 22.

### D. The Trust Agreements and Service Agreements

Until it was removed from the position in 2004, Defendant Putnam served as the Plan's Trustee pursuant to its trust agreements with Cardinal dated July 1, 1998 ("1998 TA") and January 2, 2001 ("2001 TA") (collectively, the "Trust Agreements").[11] Consistent with the Plan,

---

[10]"Shares" are defined in Plan § 1.40 as "[t]he no par value common shares of [Cardinal]." App. Ex. Tabs 1 and 2.

[11]29 U.S.C. § 1103(a) reads:

(a) Benefit plan assets to be held in trust; authority of trustees
Except as provided in subsection (b) of this section, all assets of an employee benefit plan shall be held in trust by one or more trustees. Such trustee or trustees shall be either named in the trust instrument or in the plan instrument described in section 1102(a) of this title or appointed by a person who is a named fiduciary, and upon acceptance of

the Trust Agreements provided that Putnam was to be directed by the Administrator in the selecting the investment funds made available to participants.  As contemplated by the Trust Agreements, Putnam's obligations to the Plan were also discussed in Service Agreements effective as of July 1, 1998 ("1998 SA") and July 1, 2002 ("2002 SA") (collectively, the "Service Agreements").  The Service Agreements contained the "initial available investment options" selected by Cardinal to be available to the Plan participants.  Consistent with the Plan provisions, the first investment option listed in each relevant Service Agreement was the Cardinal Stock Fund (the "Fund").

### E. The Allegations

During the Class Period, Cardinal was undergoing a significant transition from a B+H to a FFS distribution model.  As set forth above, Plaintiffs argue that, to maintain its viability as a successful company in the face of its reorganization efforts, Cardinal artificially inflated its stock price by using fraudulent accounting techniques.  In 2002, the SEC began an informal investigation of Cardinal, which was later elevated to a formal investigation.  In the wake of this

---

being named or appointed, the trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the plan except to the extent that —
> (1) the plan expressly provides that the trustee or trustees are subject to the direction of the named fiduciary who is not a trustee, in which case the trustees shall be subject to proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to this chapter, or
> (2) authority to manage, acquire, or dispose of assets of the plan is delegated to one or more investment managers pursuant to section 1102(c)(3) of this title.

29 U.S.C. § 1103(a).

investigation, Cardinal was forced to restate some of its past financial reports. After Cardinal made these corrections, its stock price fluctuated significantly. By the end of the Class Period, Cardinal stock had declined by approximately 5 percent from its price at the start of the Class Period. *See* Defs.' Ex. F.

In the wake of Cardinal's declining stock price, on April 29, 2005, Plaintiffs filed this three-count complaint pursuant to ERISA sections 502(a)(2) and 502(a)(3).[12] The Complaint alleges that the Cardinal Defendants breached their fiduciary duties by continuing to offer the Company Stock Fund as one of the Plan alternatives when they knew or should have known that

---

[12]ERISA §§ 502(a)(2) and (a)(3) state:

(a) Persons empowered to bring a civil action
    A civil action may be brought – . . .
        (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title.
        (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate *equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter to the terms of the plan.

29 U.S.C. § 1132(a)(3). Further ERISA § 409 states:

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. . .
(b) No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

29 U.S.C. § 1109.

Cardinal's stock price was artificially inflated.

### 1. Count I - Breach of Duties of Loyalty and Prudence

Count I alleges that all the Defendants breached their fiduciary duties of loyalty and prudence by designating the Fund as an investment option, permitting the Plan to invest in the Fund, and permitting the Fund to invest in Cardinal Stock when the Cardinal stock was an imprudent investment. *See* Complaint ¶¶ 77-91. Specifically, Count I alleges that it was inadvisable for the Plan to invest in Cardinal Stock when its price was artificially inflated by "undisclosed materially adverse information," and Cardinal's "accounting improprieties in violation of generally accepted accounting principles," which led to "an October 2003 informal inquiry, and a May 6, 2004 formal investigation by the SEC, and eventually required the [C]ompany to restate three years of [past] earnings results." *Id*. ¶ 78.

### 2. Count II - Material Misrepresentation and Negligent Omissions

Count II alleges that all of the Defendants except Putnam breached their fiduciary duties by both negligently misstating and failing to disclose "material information necessary for Participants to make informed decisions concerning Plan assets and benefits." *See* Complaint ¶¶ 92-101.

### 3. Count III - Failure to Monitor

Count III alleges that Cardinal and the Director Defendants breached their fiduciary duties by failing to appoint fiduciaries with the knowledge and expertise necessary to manage Plan assets, by failing to monitor those fiduciaries properly, and by failing to provide sufficient information to both Plan participants and Plan fiduciaries. *See* Complaint ¶¶ 102-10.

### F. The Dispute

This Opinion addresses the various motions to dismiss filed by the Defendants named in the ERISA class action. Among other things, the Defendants contend the following: (1) Plaintiffs' claims brought under ERISA § 502(a)(3) fail because Plaintiffs have demanded monetary damages, not "equitable relief"; (2) as to Count I, Plaintiffs have not alleged an "abuse of discretion" by Defendants in offering Cardinal Stock as an investment option; (3) as to all three Counts, Plaintiffs have failed to allege facts showing that the Defendants are "fiduciaries" under ERISA; (4) as to Count II, Plaintiffs have not pled loss causation and have not alleged Plaintiffs' actual reliance on Defendants' alleged misstatements; and (5) as to Count III, Plaintiffs' claim should be dismissed because it is derivative of Plaintiffs' other claims and because there is no *respondeat superior* liability under ERISA.

### III. STANDARD OF REVIEW

### A. Motion to Dismiss

In considering a Rule 12(b)(6) Motion to Dismiss, the Court is limited to evaluating whether a plaintiff's complaint sets forth allegations sufficient to make out the elements of a cause of action. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir. 1983). Pursuant to Federal Rule of Civil Procedure 8, the complaint need only set forth the basis of the court's jurisdiction, a short and plain statement of the claim entitling plaintiff to relief and a demand for judgment. *See* FED. RULE CIV. PRO. 8(a). Moreover, each averment of a pleading shall be simple, concise, and direct, and all pleadings are to be construed in a manner resulting in substantial justice. *Id.* Finally, "factual pleading is required only insofar as it is necessary place a defendant on notice as to the type of claim alleged and the grounds upon which it rests. *Id.*;

*Mountain View Pharm. v. Abbott Labs*, 630 F.2d 1383, 1388 (10th Cir. 1980).

All factual allegations made by a plaintiff are deemed admitted and ambiguous allegations must be construed in his favor. *Murphy v. Sofamor Danek Group, Inc.,* 123 F.3d 394, 400 (6th Cir. 1997). A complaint should not be dismissed under Rule 12(b)(6) "'unless it appears beyond doubt that the [p]laintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While the complaint need not specify every detail of a plaintiff's claim, it must give the defendant "'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994) (quoting *Conley*, 355 U.S. at 47).

Nonetheless, this liberal standard of review does require more than the bare assertion of legal conclusions. *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted). A complaint must contain either direct or inferential allegations with respect to all the material elements necessary to sustain a recovery under some viable legal theory. *Id*. (citations omitted).

### B. ERISA Pleading Requirements

Unlike claims of fraud brought pursuant to Federal Rule of Civil Procedure 9(b), which require a heightened standard of pleading, claims brought under ERISA are subject only to the simplified pleading standard of Federal Rule of Civil Procedure 8. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Accordingly, to survive this motion to dismiss, the Complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id*.; FED. RULE CIV. PRO. 8(a).

To state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege that:

(1) the defendant was a fiduciary of an ERISA plan who, (2) acting within his capacity as a fiduciary, (3) engaged in conduct constituting a breach of his fiduciary duty.  *See* 29 U.S.C. § 1109; *see In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2005 WL 563166, at *2 (S.D.N.Y. Mar. 10, 2005).

In considering a defendant's motion to dismiss, it is proper for the Court to take into account any relevant plan documents.  Courts may consider ERISA plan documents not attached to a complaint where a plaintiff's claims are "based on rights under the plans which are controlled by the plans' provisions as described in the plan documents" and where the documents are "incorporated through reference to the plaintiff's rights under the plans, and they are central to plaintiff's claims.  *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997); *see also City of Monroe Employees Retirement Sys. v. Bridgestone Corp.*, 399 F.3d 651, 659 n. 6 (6th Cir. 2005) (considering the impact of annual reports referenced in the complaint).

## IV. ANALYSIS

### A. ERISA Background & the Statutory Framework of ERISA

Congress enacted ERISA "after 'almost a decade of studying the nation's Private Pension Plans' and other employee benefit plans."  *See Unaka Co., Inc. v. Unaka Co., Inc.*, 2005 WL 1118065, at *13 (E.D. Tenn. Apr. 26, 2005); *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 569 (1985).  ERISA is a "comprehensive and reticulated statute," which is designed to protect employee pensions and benefit plans by, among other things, "setting forth certain general fiduciary duties applicable to the management of both pension and nonpension benefit plans."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993); *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996).  Employers are not required to establish

14

employee benefit plans, but if they choose to do so, they must abide by ERISA. *Id*.

Through ERISA, Congress wanted to ensure that if an employee was promised a benefit, he would receive it. *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Thus, ERISA "protect[s]. . . the interest of participants in employee benefit plans and their beneficiaries. . ., by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and access to the federal courts." *Id*. (citing 29 U.S.C. § 1001(b)). ERISA accomplishes this goal by mandating that private pension plan assets are to be held in trust for the exclusive benefit of plan participants and beneficiaries. *Id*. (citing 29 U.S.C. § 1103(a)). ERISA requires such plans to name fiduciaries who shall have the authority to control and manage the operation and administration of the plan. *Id*. (citing 29 U.S.C. § 1102(a)(2)). These fiduciaries need not be independent parties; the employer or plan sponsor may appoint its own "officer, employee, agent, or other representative" to serve in a fiduciary capacity. *Id*. (citing 29 U.S.C. § 1108(c)(3)).

## 1. ERISA Fiduciaries

A person or entity is considered an ERISA "named fiduciary" if the written instruments governing an ERISA employee benefit plan designate his fiduciary status.[13] Nonetheless, persons or entities who are *not* named as fiduciaries in plan documents but who exercise

---

[13]ERISA requires every employee benefit plan to be established and maintained pursuant to a written instrument that provides for one or more "named fiduciaries" who "jointly or severally shall have authority to control and manage the operation and administration of the plan." *See* 29 U.S.C. § 1102(a)(1). The term "named fiduciary" means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly. *See* 29 U.S.C. § 1102(a)(2). In this case, both parties acknowledge that Cardinal is the sole named fiduciary under the Plan.

discretionary authority and control that amounts to actual decision-making power may still be considered "functional fiduciaries" with respect to the plan. A person is a functional fiduciary with respect to a plan to the extent he:

> (i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets;
> (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any discretionary authority or responsibility to do so; or
> (iii) has any discretionary authority or discretionary responsibility in the administration of such plan.

*See* 29 U.S.C. § 1102(21)(A).  The Sixth Circuit has observed that "anyone who exercises authority over an employee benefit plan can properly be held an ERISA fiduciary because that term was intended to be interpreted broadly by Congress. . ."  *See In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, 826 (S.D. Ohio 2004) (Marbley, J.) (citing *Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir. 1988)).  Courts have clarified, however, that "a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control."  *See Dynegy*, 309 F. Supp. 2d at 873.

### a. Fiduciary Duties Under ERISA

An ERISA fiduciary "shall discharge his duties. . . solely in the interest of the participants and beneficiaries" and must act "with the care, skill, prudence and diligence under circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  The duties charged to an ERISA fiduciary are "the highest known to the law."  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002) (quoting *Howard v.*

16

*Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)). The duties of a fiduciary are set forth in ERISA §

404(a)(1) which states:

> . . . [a] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and --
> (A) for the exclusive purpose of:
>> (i) providing benefits to participants and their beneficiaries; and
>> (ii) defraying reasonable expenses of administering the plan;
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
> (D) in accordance with the documents and instruments governing the plan.

29 U.S.C. § 1104(a)(1).

The Sixth Circuit has enumerated three general duties of pension plan fiduciaries under

Section 1104(a)(1). *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995). The first is a "duty

of loyalty" pursuant to which "all decisions regarding an ERISA plan 'must be made with an eye

single to the interest of the participants and beneficiaries.'" *Id*. The second obligation imposed

under ERISA, the "prudent person" obligation, imposes "an unwavering duty" to act both "as a

prudent person would act in a similar situation" and "with single minded devotion" to those

same plan participants and beneficiaries. *Id*. Finally, an ERISA fiduciary must "act for the

exclusive purpose" of providing benefits to plan beneficiaries. *Id*. (quoting *Berlin v. Michigan

Bell Tele. Co.*, 858 F.2d 1154, 1162 (6th Cir. 1988) and *Donovan v. Bierwirth*, 680 F.2d 263, 271

(2d Cir. 1982)). Indeed, "[a] fiduciary breaches his duty by providing plan participants with

materially misleading information, 'regardless of whether the fiduciary's statements or omissions

were made negligently or intentionally.'" *See AEP*, 327 F. Supp. 2d at 819 (citing *James v.*

17

*Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002)).[14]

According to the Supreme Court "[f]iduciaries are assigned a number of detailed duties and responsibilities, which include 'the proper management, administration, and investment of [plan] assets, the maintenance of proper records, the disclosures of specified information, and the avoidance of conflicts of interest.'" *Mertens*, 508 U.S. at 248.  In *Varity Corp.*, the Court elaborated that:

> [t]here is more to plan (or trust) administration than simply complying with the specific duties imposed by the plan documents or statutory regime; it also includes the activities that are "ordinary and natural means"of achieving the "objective" of the plan.  Indeed, the primary function of the fiduciary duty is to constrain the exercise of discretionary powers which are controlled by no other specific duties imposed by the trust instrument or the legal regime.  If the fiduciary duty applied to nothing more than activities already controlled by other specific duties, it would serve no purpose.

*Varity Corp.*, 516 U.S. at 504.

### i. Loyalty

ERISA requires fiduciaries to discharge their duties with respect to a plan "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).  In other words, "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  *See id*. § 1104(a)(1)(A).  In *Pegram*, the Supreme Court explained that the fiduciary responsibilities imposed by this section of

---

[14]The Sixth Circuit recognized in *Krohn v. Huron Mem. Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999), that, "[a]lthough the United States Supreme Court has expressly declined to reach the question of whether ERISA imposes a duty on fiduciaries to disclose truthful information on their own initiative, . . . we have previously held that '[a] fiduciary must give complete and accurate information in response to participants regarding plan administration (for example, eligibility under a plan, [or] the extent of benefits under a plan) . . . [and] 'a fiduciary breaches its duties by materially misleading plan participants, regardless of whether the fiduciary's statements or omissions were made negligently or intentionally.'" (internal citations omitted).

ERISA arise from the common law of trusts. *See* 530 U.S. 211, 224 (2000) (quoting *Central States, Southeast & Southwest Areas Pension Fund*, 472 U.S. at 559 ("[R]ather than explicitly enumerating *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility.")); *see also*, *Harris Trust & Savs. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 240 (2000) ("The common law of trusts. . . offers a starting point for analysis of [ERISA]. . . [unless] it is inconsistent with the language of the statute, its structure, or its purposes."). "Beyond the threshold statement of responsibility, however, the analogy between ERISA fiduciary and common law trustee becomes problematic. . . because the trustee at common law characteristically wears only his fiduciary hat when he takes action to affect a beneficiary, whereas the trustee under ERISA may wear different hats." *Pegram*, 530 U.S. at 224.

### (a) "Two Hat" Doctrine

Comparing a traditional trustee to an ERISA fiduciary, the *Pegram* Court explained that while a traditional fiduciary "is not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries. . . [u]nder ERISA. . . a fiduciary may have financial interests adverse to beneficiaries." 530 U.S. at 224 (citing 2A A. Scott & W. Fratcher, Trusts § 170, 311 (4th ed. 1987)). "Employers, for example, can be ERISA fiduciaries and still take actions that disadvantage employee beneficiaries when they act as employers (*e.g.,* firing a beneficiary for reasons unrelated to the ERISA plan), or even as plan sponsors (*e.g.*, modifying the terms of a plan as allowed by ERISA to provide less generous benefits)." *Id*. The *Pegram* court also recognized that:

> [t]he law does not require employers to establish employee benefit plans. Congress
> sought to encourage employers to set up plans voluntarily by offering tax incentives,

19

> methods to limit fiduciary liability, means to contain administrative costs, and giving employers flexibility and control over matters such as whether or when to establish an employee benefit plan, how to design a plan, how to amend a plan, when to terminate a plan, all of which are generally viewed as business decisions of a settlor, not of a fiduciary, and thus not subject to fiduciary obligations.

*See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 551 (S.D. Tex. 2003) (citing *Pegram*, 530 U.S. at 224.).  Moreover, in *Pegram*, the Supreme Court also recognized that there exists no "apparent reason in the ERISA provisions to conclude. . . that this tension is permissible only for the employer or plan sponsor, to the exclusion of persons who provide services to an ERISA plan."  *See* 530 U.S. at 224.

### (b) One Hat at a Time

ERISA requires, however, "that a fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions."  *Pegram*, 530 U.S. at 224 (citing *Varity Corp.*, 516 U.S. at 489).  Thus, ERISA does not define "fiduciaries simply as administrators of the plan, or managers or advisers. . . [i]nstead, it defines an administrator, for example, as a fiduciary only 'to the extent' that he acts in such a capacity in relation to a plan." *Id*. (citing 29 U.S.C. § 1002(21)(A)).

As a result, in every case charging a defendant with the breach of an ERISA fiduciary duty, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to the complaint.  *See Dynegy*, 309 F. Supp. 2d at 861, 874-75 (citing *Pegram*, 120 S.Ct. at 2152-53).

### ii. Prudence

Pursuant to the duty of prudence, a fiduciary must act "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  *See* 29 U.S.C. § 1104(a)(1)(B). The Fifth Circuit has stated:

> [i]n determining compliance with ERISA's prudent [person] standard, courts objectively assess whether the fiduciary, at the time of the transaction, utilized proper methods to investigate, evaluate and structure the investment; acted in a manner as would others familiar with such matters; and exercised independent judgment when making investment decisions. [ERISA's] test of prudence. . . is one of conduct, and not a test of the performance of the investment.  The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed.  Thus, the appropriate inquiry is whether the individual[s]. . . at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.

*Laborers Nat'l Pension Fund v. N'ern Trust*, 173 F.3d 313, 317 (5th Cir. 1999).

Regulations promulgated by the Department of Labor ("DOL") generally reflect that a fiduciary with investment duties must act as a prudent investment manager under the modern portfolio theory[15] rather than under the common law of trusts standard, which examined each investment with an eye toward its individual riskiness.  *Id.* (citing 29 C.F.R. § 2550.404a-1). Because the "prudent person" standard focuses on whether the fiduciary utilized appropriate methods to investigate and evaluate the merits of a particular investment, what is considered "appropriate" in a particular case depends upon "the 'character' and 'aim' of the particular plan and decisions at issue and the 'circumstances prevailing' at the time a particular course of action

---

[15]Modern Portfolio Theory (or "MPT") proposes that investors focus on selecting investment portfolios based on their overall risk-reward characteristics instead of merely compiling portfolios from securities that each individually have attractive risk-reward characteristics.  Essentially, according to MPT, investors should select portfolios, not individual securities.  *See* "Portfolio Theory," available at http://www.riskglossary.com/link/portfolio_theory.htm (last viewed Feb. 21, 2006).

must be investigated and undertaken." *See Dynegy*, 309 F. Supp. 2d at 875 (citing *Bussian v.

RJR Nabisco, Inc*., 223 F.3d 286, 299 (5th Cir. 2000)).  Furthermore, the "prudent person"

standard is an objective standard, and good faith is not a defense to a claim of imprudence. *Id*.;

*see also, Enron*, 284 F. Supp. 2d at 548.

### iii. Diversification

ERISA requires fiduciaries to diversify "the investments of the plan so as to minimize the

risk of large losses unless, under the circumstances, it is clearly prudent not to do so." *See* 29

U.S.C. § 1104(a)(1)(c). The Court in *Metzler v. Graham* explained:

> The degree of investment concentration that would violate this requirement to diversify
> cannot be stated as a fixed percentage, because a fiduciary must consider the facts and
> circumstances of each case.   The factors to be considered include[:] (1) the purposes of
> the plan; (2) the amount of the plan assets; (3) financial and industrial conditions; (4) the
> type of investment, whether mortgages, bonds or shares of stock or otherwise; (5)
> distribution as to geographical location; (6) distribution as to industries; (7) dates of
> maturity.

*Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1995) (citing H.R.Rep. No. 1280 93d Cong., 2d

Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5084-85 (Conf. Rept. at 304)).  The court

also noted, "[w]e think it is entirely appropriate for a fiduciary to consider the time horizon over

which the plan will be required to pay out benefits in evaluating the risk of large loss from an

investment strategy." *Id*. at 876.  Moreover, the court admonished lower courts that "[i]t is

clearly imprudent to evaluate diversification solely in hindsight – plan fiduciaries can make

honest mistakes that do not detracts from a conclusion that their decisions were prudent at the

time." *Id*. at 209.

### iv. Diversification Exceptions

ERISA, however, has some "carve-out exceptions" for plans meeting certain qualifications. For instance, 29 U.S.C. § 1107 permits an employee pension plan to acquire and hold qualifying employer securities provided that the aggregate fair market value of employer securities[16] held by the plan does not exceed 10 percent of the fair market value of the assets of the plan immediately after such acquisition. *See* 29 U.S.C. § 1107.

As set forth above, ERISA's "prudent person" standard of care requires plan fiduciaries to diversify the plan's investments[17] so as to minimize the risk of large losses, unless under the circumstances it clearly would not be prudent to do so. *See Kuper*, 66 F. 3d at 1458. There exist, however, special ERISA plans defined as "eligible independent account plans" ("EIAPs"). A plan is an EIAP when it is an individual account plan which is also a profit sharing, stock bonus, thrift, or savings plan. *Id*. § 1107(d)(3)(A). In the case of an EIAP, however, the diversification requirement and the prudence requirement (to the extent that it requires diversification) are not violated by acquisition of or holding of qualifying employer securities. 29 U.S.C. § 1103(a)(1)(c) and (2). This special rule for EIAPs reflects a "strong policy and preference in favor of investment in employer stock." *Unaka Co.*, 2005 WL 1118065, at *15 (citing *Fink v.*

---

[16]"Qualifying employer security" means, among other things, stock issued by an employer of employees covered by the plan or by an affiliate of such employer. In this case, the Cardinal stock held by the Plan is a qualifying employer security.

[17]The Fifth Circuit established, "[w]e think it is entirely appropriate for a fiduciary to consider the time horizon over which the plan will be required to pay out benefits in evaluating the risks of large loss from an investment strategy. . . It is clearly imprudent[, however,] to evaluate diversification solely in hindsight-plan fiduciaries can make honest mistakes that do not detract from a conclusion that their decisions were prudent at the time." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983); *see also, Metzler*, 112 F.3d at 209 & 210 n. 6.

23

*Nat'l Savings and Trust Co.*, 772 F.3d 951, 956 (D.C. Cir. 1985)).

One special type of EIAP is an employee stock ownership plan ("ESOP"), which is an ERISA plan investing primarily in "qualifying employer securities" – usually shares of stock in the employer creating to plan. *See* 29 U.S.C. § 1107(a)(6)(A). Congress envisioned that an ESOP would function both as an employee retirement benefit plan and a technique of corporate finance that would encourage employee ownership. *Kuper*, 66 F.3d at 1457; *see Unaka Co.*, 2005 WL 1118065, at *15. Because of these dual purposes, ESOPs are not designed to guarantee retirement benefits, and they place employee retirement assets at much greater risk than the typical diversified ERISA plan. *Id*.

In *Kuper*, the court found that "despite this recognition that ESOPs place employee assets at a greater risk, the purpose of ESOPs cannot override ERISA's goal of ensuring the proper management and soundness of employee benefit plans." *Kuper*, 66 F.3d at 1457. These competing concerns, that is, Congress' intent to encourage the formation of ESOPs by passing legislation granting such plans special treatment on the one hand and the competing policy of ERISA, that of safe-guarding the interest of participants in employee benefit plans on the other, make it more difficult to delineate the responsibilities of ESOP fiduciaries. *See Unaka Co.*, 2005 WL 1118065, at *15.

The Sixth and Third Circuits have held that a proper balance between the purpose of ERISA and the nature of ESOPs requires that an ESOP fiduciary's decision to invest in employer securities be reviewed for an "abuse of discretion." *Kuper*, 66 F.3d at 1459; *see Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995). *Kuper* creates a presumption that a fiduciary's decision to remain invested in employer securities was reasonable. 66 F.3d at 1459. A plaintiff may then

24

rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision.[18] *Id*.

Reasonable reliance upon advice received from the plan's legal and financial advisors may not be a defense to a charge that fiduciaries have not acted prudently. Reliance on the advice of counsel or a financial advisor, however, without more, will not insulate a fiduciary from being found to have breached his fiduciary duties. *See Unaka Co.*, 2005 WL 1118065, at *16; *Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983). "Although securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation, it is not a complete defense to a charge of imprudence." *Martin v. Feilen*, 965 F.2d 660, 670-71 (8th Cir. 1992); *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (citing *Mazzola*, 716 F.2d at 1234). Further, "independent expert advice is not a whitewash." *Id*. (citing *Donovan v. Bierwirth*, 680 F.3d 263, 272 (2d Cir. 1982)). Three requirements must be met before a fiduciary may rely upon expert advice. *Unaka Co.*, 2005 WL 1118065, at *16. The fiduciary must: (1) investigate the expert's qualifications; (2) provide the expert with complete and accurate information; and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances. *Id*. (citing *Howard*, 100 F.3d at 1489).

Under the abuse of discretion standard, plaintiffs have the burden of proving not only that

---

[18]Nonetheless, ESOPs are governed by ERISA's requirements for fiduciaries. An ERISA fiduciary must employ within the defined domain "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." *See LaLonde v. Textron, Inc.*, 369 F.3d 1, 5 n.7 (1st Cir. 2004) (citing 29 U.S.C. § 1104(a)(1)(B)). If a fiduciary fails to meet these stringent requirements, it may be held liable for losses to the plan that result from breaches of that duty. 29 U.S.C. § 1109(a). Consequently, ESOP fiduciaries are in the unique situation of having to facilitate the ESOP goal of employee ownership, while at the same time being bound by ERISA's rigorous fiduciary obligations. *LaLonde*, 369 F.3d at 5 n. 7 (citations and internal quotation marks omitted).

defendants breached their fiduciary duties, but also that such breaches caused a loss to the plan. *Kuper*, 66 F.3d at 1459; *Silverman v. Mut. Ben. Life Ins. Co.*, 138 F.3d 98 (2d Cir. 1998); *Willett v. Blue Cross*, 953 F.2d 1335, 1343 (11th Cir. 1992); *Call v. Sumitomo Bank*, 881 F.2d 626, 633 (9th Cir. 1989).  ERISA's plain language also makes clear that a fiduciary is a person liable to a plan *only* for losses to the plan resulting from the breach.  *See* 29 U.S.C. § 1109(a).  Upon finding a breach of fiduciary duty resulting in loss to the plan, the court may award damages and award prevailing parties their reasonable and necessary fees and costs incurred in pursuing the breach of fiduciary duty claims.  *See* 29 U.S.C. § 1132(g).

### v.  Compliance

ERISA requires fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]."  *See* 29 U.S.C. § 1104(a)(1)(D).  "In case of a conflict, the provisions of ERISA policies as set forth in the statute and regulations prevail over those of the Fund guidelines."  *See Dynegy*, 309 F. Supp. 2d at 876 (citing *Laborers Nat'l*, 173 F.3d at 322); *see also Central States*, 105 S.Ct. at 2833 ("[T]rust documents cannot excuse trustees from their duties under ERISA, and . . . trust documents must generally be construed in light of ERISA's policies."); *Donovan*, 716 F.2d at 1467 ("Though freed by Section 408 from the prohibited transaction rules, ESOP fiduciaries remain subject to the general requirements of Section 404."); *Moench*, 62 F.3d at 567 (where the plan language "constrains the [a fiduciary's] ability to act in the best interest of the beneficiaries," it is inconsistent with ERISA and with the common law of trusts and must not be followed).

**b. Remedies for Breach**

ERISA makes fiduciaries liable for breach of their duties, and specifies the remedies

available against them.  *See Mertens*, 508 U.S. at 251 (citing 29 U.S.C. § 1109(a)).  The statute

provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations or duties imposed upon fiduciaries by this subchapter shall
> be personally liable to make good to such plan any losses to the plan resulting from each
> such breach, and to restore to such plan any profits of such fiduciary which have been
> made through use of assets of the plan by the fiduciary, and shall be subject to such other
> equitable or remedial relief as the court may deem appropriate including removal of such
> fiduciary. . . .

29 U.S.C. § 1109(a).  Because § 1109 does not distinguish between *named* fiduciaries and

*functional* fiduciaries, it is applicable to both types of ERISA fiduciaries.  *See Enron*, 284 F.

Supp. 2d at 545-46.

ERISA allows any plan participant, beneficiary, or fiduciary to bring a civil action "for

appropriate relief under section 1109."  *Mertens*, 508 U.S. at 253 (quoting 29 U.S.C. §

1132(a)(2)).  Nevertheless, ERISA does not permit a civil action for legal damages against a

non-fiduciary charged with knowing participation in a fiduciary breach.  *See Dynegy*, 309 F.

Supp. 2d at 876-77; *Reich v. Rowe*, 20 F.3d 25, 29 (1st Cir. 1994) (citing *Mertens*, 508 U.S. at

253 ).  As an alternative to fiduciary liability, a non-fiduciary may be liable as a "party in

interest," but only for "appropriate equitable relief," including injunctions and equitable

restitution, in civil actions brought by plan participants under 29 U.S.C. § 1132(a)(3).  *See*

*Useden v. Acker*, 947 F.2d 1563, 1581-82 (11th Cir. 1991); *Useden v. Greenberg, Traurig,*

*Hoffman, Lipoff, Rosen & Quentel*, 508 U.S. 959 (1993).  A party in interest of an employee

benefit plan is defined in 29 U.S.C. § 1002(14) and includes, *inter alia*, any fiduciary

27

(administrator, officer, trustee, custodian, etc.), a person that provides services to the plan (such as an accountant, attorney), an employer of any employees covered by the plan, and an employee organization, including any members covered by the plan. *See Dynegy*, 309 F. Supp. 2d at 877. Such non-fiduciaries may be held liable for such "appropriate *equitable* relief" if they are "parties in interest" and, if with actual or constructive knowledge, they participate in a fiduciary's breach of its duties in transactions between the plan and a party in interest that are expressly prohibited under 29 U.S.C. § 1106(a). *See id*.; *Enron*, 284 F. Supp. 2d at 570.

**B. Whether Plaintiffs Have Stated a Claim for Relief under ERISA § 502(a)(3)**

As a threshold consideration, the Court will consider Defendants' argument that Plaintiffs have failed to state a claim for relief under ERISA § 502(a)(3). 29 U.S.C. § 1102(a)(3); *see* Certain Defs.' Motion to Dismiss at 11. As explained above, all three counts of Plaintiffs' Complaint proceed under both Sections 502(a)(2) and 502(a)(3) of ERISA. *See supra* Part II.E. Section 502(a)(2) gives a participant a right to sue on behalf of a plan for alleged breach of fiduciary duty where any recovery goes to the plan itself. 29 U.S.C. § 1102(a)(2). Section 502(a)(3) creates a right of action for a participant to sue for "other appropriate equitable relief" to remedy violations of ERISA. 29 U.S.C. § 1102(a)(3).[19]

In their Prayer for Relief, Plaintiffs demand: (1) a declaration that Defendants have breached their ERISA fiduciary duties to the participants; (2) an order compelling the Defendants to "make good" to the Plan all losses to the Plan resulting from Defendants' breaches

---

[19]Plaintiffs note, and this Court agrees, that Defendants do not challenge Plaintiffs' authority to recover losses on behalf of the Plan pursuant to ERISA Section 502(a)(2). *See* Pl.'s Opposition at 33. As such, regardless of whether the Court finds that Plaintiffs have standing under ERISA Section 502(a)(3), they will still have claims arising under section 502(a)(2).

of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the

Plan's assets, and to restore to the Plan all profits which the participants would have made if the

Defendants had fulfilled their fiduciary obligations; (3) the imposition of a constructive trust on

any amounts by which any Defendant was unjustly enriched at the Plan's expense as the result of

breaches of fiduciary duty; (4) an order enjoining Defendants from any further violations of their

ERISA fiduciary obligations; (5) actual damages in the amount of any losses the Plan suffered,

to be allocated among the participants' individual accounts in proportion to the accounts' losses;

(6) equitable relief; (7) costs pursuant to 29 U.S.C § 1132(g)[20]; (8) attorneys' fees pursuant to 29

U.S.C. § 1132(g) and the common fund doctrine; and (9) such other relief as the Court may deem

---

[20]ERISA § 502(g) reads:

(g) Attorney's fees and costs; awards in actions involving delinquent contributions
    (1) In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.
    (2) In any action under this subchapter by a fiduciary for or on behalf of the plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan –
        (A) the unpaid contributions,
        (B) interest on the unpaid contributions,
        (C) an amount equal to the greater of –
            (i) interest on the unpaid contributions, or
            (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the age as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
        (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
        (E) such other legal or equitable relief as the court deems appropriate. . .

29 U.S.C. § 1132(g).

29

equitable and just.  *See* Complaint ¶ 111.

Defendants contend that Plaintiffs' Prayer for Relief is a feeble attempt to disguise money damages as an "equitable remedy."  Accordingly, Defendants argue that all three counts of the claims brought under Section 502(a)(3) should be dismissed because that section does not allow plaintiffs to recover monetary relief.  Plaintiffs, however, counter that their requests for statutory costs, attorney's fees, declaratory relief, injunctive relief, and the imposition of a constructive trust on any amounts by which Defendants were unjustly enriched are all permissible *equitable* remedies.

ERISA allows plan beneficiaries, plan administrators, and the Secretary of Labor to enforce its provisions.  *See* 29 U.S.C. § 1132(a)(1)-(6).  ERISA, however, distinguishes between those parties in the types of relief it makes available to them.  *See Helfrich v. PNC Bank, Kentucky, Inc.*, 267 F.3d 477, 481 (6th Cir. 2001).  Acting on behalf of a benefit plan, the Secretary of Labor and the plan administrator are entitled to seek the full gamut of legal and equitable relief.  *See id.*; *see* 29 U.S.C. § 1132(a)(1)-(6).  In contrast, ERISA restricts plan beneficiaries to equitable relief with no recourse to money damages.  *See* 28 U.S.C. § 1132(a)(3); *Mertens*, 508 U.S. at 255 (holding that ERISA does not authorize suits for money damages against non-fiduciaries who knowingly participate in a fiduciary's breach of fiduciary duty); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2001) (finding that ERISA § 502(a)(3) does not authorize petitioners to seek the imposition of personal liability on respondents for a contractual obligation to pay money because it is akin to legal relief); *Helfrich*, 267 F.3d at 481 (dismissing plaintiff's claim under § 502(a)(3) requesting that defendant bank should compensate him for the losses he suffered because the bank failed to transfer his assets to

higher performing mutual funds because it was a claim for *money damages*, not equitable

restitution); *Qualchoice, Inc. v. Rowland,* 367 F.3d 638, 648-50 (6th Cir. 2003) (because the

source of the claim asserted by plaintiffs was a "contract to pay money," and the procedural

mechanisms of constructive trust and equitable lien were not proper mechanisms for enforcing

this right as, traditionally, they would not have been awarded by a court of equity in a breach of

contract action, the court dismissed plaintiffs' claims under ERISA § 502(a)(3) for lack of

subject matter jurisdiction).  The Supreme Court in *Mertens* noted that, "[a]lthough they often

dance around the word, what petitioners in fact seek is nothing other than compensatory

*damages* – monetary relief for all losses their plan sustained as a result of the alleged breach of

fiduciary duties.  Money damages are, of course, the classic form of *legal* relief."  508 U.S. at

255 (citing *Curtis v. Loether*, 415 U.S. 189, 196 (1974)).

 The Defendants primarily rely on *Crosby v. Bowater, Inc. Retirement Plan for Salaried*

*Employees of Great N'ern. Paper Inc.  See* 382 F.3d 587 (6th Cir. 2004) (finding that because he

requested monetary damages, not equitable relief, plaintiff did not have a justiciable claim under

§ 502(a)(3)).  In *Crosby*, Mr. Crosby, an employee benefit plan participant who had opted to

receive lump-sum cash payment for early retirement benefits brought a class action against the

plan and the plan administrator on behalf of himself and similarly situated plan participants

alleging that the administrator's use of a "mortality discount for [the] period before normal

retirement age" caused partial forfeiture of his accrued benefit in violation of ERISA.  382 F.3d

at 587.  In Crosby's "prayer for relief," he requested that the court order the defendants to do the

following: (1) re-compute any and all lump sum benefits previously paid using the methodology

followed in the recomputation of Mr. Crosby's lump sum retirement *without* using a mortality

discount for the period before normal retirement age; and (2) pay all plan participants who previously received a lump sum distribution the difference between the amount so computed and the lump sum amount the participant received from the Plan, plus the pre-judgment and post-judgment interest on this amount; and requested that the court: (3) enjoin defendants from using a mortality discount when computing lump sum distributions from the Plan in the future; (4) order the defendants to pay reasonable attorney's fees and costs; (5) impose a constructive trust over the amount of plan assets necessary to pay the amounts determined; and (6) award any other equitable relief the Court deemed appropriate. *See id.* at 592.

The Sixth Circuit, focusing its analysis on Mr. Crosby's claim for a "constructive trust," determined that the foregoing requested relief, though labeled as equitable, was substantively legal. *See Crosby*, 382 F.3d at 595-96. The Sixth Circuit, however, found that, Mr. Crosby was not seeking to have a constructive trust imposed on assets wrongfully conveyed to a third party. *Id*. The Court reasoned that "Mr. Crosby [asked] for imposition of a constructive trust over sufficient assets to assure that his claim [would] be paid, thereby putting him in a better position than he would occupy as a general creditor. But Crosby has no basis for obtaining such a priority." *Id*. at n. 8.

In this case, Plaintiffs' "Prayer for Relief" is structured almost identically to that in *Crosby. See id.* at 591-92; Complaint ¶ 111. Also, like Mr. Crosby, Plaintiffs ask the Court to refund the difference between the artificially inflated price they paid for their Cardinal stock, and the price the stock price was *actually* worth. *Id*. Consequently, the Court finds that, though Plaintiffs try to mask their requested relief as equitable, in truth, it is nothing more than "compensatory damages": monetary relief for the losses their plan sustained as a result of the

32

alleged breach of fiduciary duties.  The Court, therefore, **GRANTS** Defendants' Motion to

Dismiss **Counts I, II,** and **III** brought under ERISA § 502(a)(3).  All claims asserted under

ERISA § 502(a)(2), however, remain, and a discussion of these claims follows.[21]

### C. Defendants' Various Motions to Dismiss

All the named Defendants have either submitted or joined in a motion to dismiss *all* of

the claims asserted against them.  Because Plaintiffs' Complaint does not identify specific

Defendants allegedly liable for the alleged breaches, but contains more general allegations

asserted against groups of Defendants (i.e. the "Director Defendants," or the "Committee

Defendants"), and because Plaintiff has submitted one omnibus Memorandum in Opposition to

all but two of the pending motions,[22] the briefing is replete with overlapping issues and

arguments.  The Court, therefore, will discuss each claim for relief asserted against *each* group

of Defendant(s).  Moreover, where possible, the Court will address any arguments raised in

opposition to multiple claims only once.

### 1. Defendants' Fiduciary Obligations

With respect to Counts I-III generally, the following Plan documents set out the fiduciary

obligations of the various players (if any) and echo the law established under ERISA discussed

in Part IV.A., *supra*.

---

[21]Defendants note that in *AEP*, this Court declined to discuss the issue of whether plaintiffs can request money damages under ERISA § 502(a)(3).  *See* 327 F. Supp. 2d 812.  In that case, the Court acknowledged, "that this particular issue is controversial and so [the Court] refuses to decide it here. . . without a full briefing by the parties after discovery."  *See id*. at 821 n. 4.  Nonetheless, the Court finds that the Sixth Circuit's findings in *Crosby*, decided one month after *AEP*, should guide its analysis here.

[22]Plaintiffs filed both an Opposition in response to Defendant Putnam's Motion to Dismiss and an Opposition in response to Defendant Miller's Motion to Dismiss.

Under § 10.01, Cardinal is the sole named "Plan Administrator. *See* App. Ex. A § 10.01; App. Ex. B § 10.01. Under § 10.02, the Cardinal Board of Directors has the duty to appoint the members of a Committee which will assist Cardinal in the administration of the Plan. *Id*. § 10.02. Accordingly, under § 8.02, Cardinal must provide the Committee with any information that it determines necessary for the proper administration of the Plan, and to the Trustee, Cardinal must provide any such facts as are deemed necessary for the Trustee to carry out its duties under the Plan. *Id*. § 8.02.

Under § 10.01 Cardinal has sole discretion in appointing, removing and replacing the Trustee. Cardinal is a fiduciary to the Plan to the extent it exercises discretionary control and authority over these specific matters.[23] *Id*. § 10.01. The duties of the Committee appointed by the Cardinal Board of Directors are laid out in § 10.05 of the Plan and include directing the Trustee "with respect to the crediting and distributing of the Trust," "engag[ing] the service of an Investment Manager or Investment Managers. . . each of whom shall have full power and authority to manage, acquire or dispose (or direct the Trustee with respect to acquisition or disposition) of any Plan asset under its control." § 10.05(D) & (H). *Id*. § 10.05.

Further, the Plan vests the Committee with additional obligations. Section 8.05 ("Investment Fund") of the Plan states that the Committee, with the help of the Trustee, is to "[e]stablish certain investment funds (the "<u>Investment Funds</u>"), rules governing [their] administration. . . and procedures for directing the investment of Participant Accounts among the Investment Funds." *Id*. § 8.05. Also, under § 8.05, the Committee and Cardinal are afforded the

---

[23]Section 10.01 expressly states, "[t]he fiduciaries shall have only those powers, duties, responsibilities and obligations as are specifically given to them under the Plan and the Trust." *See* App. Ex. A § 10.01; App. Ex. B § 10.01.

"right to change the investment options available under the Plan and the rules governing the designations at any time from time to time."  *Id*.

The Trustee, is vested by § 10.01 as having "the sole responsibility for the administration of the Trust and the management of the assets held under the Trust as specifically provided in the Trust."  *Id*. § 10.01.  The Plan qualifies that responsibility in § 10.03, however, when the Committee may direct the Trustee with respect to the crediting and distribution of the Trust, and in § 10.01, which reads,

> [e]ach fiduciary warrants that any directions given, information furnished, or action taken by it shall be in accordance with the provisions of this Plan and the Trust, authorizing or providing for any such direction, information or action.  Furthermore, each fiduciary may rely upon any such direction, information or action of another fiduciary as being proper under this Plan and the Trust, and is not required under this Plan or the Trust to inquiry into the propriety of any such direction, information or action.  It is intended under the Plan and the Trust that each fiduciary shall be responsible for the proper exercise of its own powers, duties, responsibilities and obligations under this Plan and the Trust and shall not be responsible for any act of another fiduciary.

*Id*.

The Master Trust Agreement, names Putnam Trust as the Plan's Trustee.  Section 8 of the Plan discusses Cardinal's Trust Agreement with Putnam.  *See* App. Ex. 1 § 8, App. Ex. 2 § 8.  Section 8.05 of the Plan provides, in relevant part,

> The Committee and the Trustee shall establish certain investment funds (the "Investment Funds"), rules governing the administration of the Investment Funds, and procedures for directing the investment of Participant Accounts among the Investment Funds.  The Trustee shall invest and reinvest the principal and income of each Account in the Trust Fund as required by ERISA and as directed by Participant.  The Committee and the Employer reserve the right to change the investment options available under the Plan and the rules governing investment designations at any time and from time to time.
> The Trustee is authorized to maintain the "Employer Common Stock Fund" as one of the Investment Funds. . . In addition to the Employer Common Stock Fund, all or any portion of the remaining Trust Fund may consist of Shares.  The Trustee may acquire or dispose of Shares as necessary to implement Participant directions and may net transactions within the Trust Fund. . .

35

Each Investment Fund (other than the Employer Common Stock Fund) shall be established by the Trustee at the direction or with the concurrence of the Committee. . . The Trustee shall hold, manage, administer, invest, reinvest, account for and otherwise deal with the Trust Fund and each separate Investment Fund as Provided in the Trust Agreement.

*See id*. Further, Section 1 of the Master Trust Agreement reads, in pertinent part:

1. <u>Trustee Responsibility</u>. The Trustee shall hold the assets of and collect the income and make payments from the Master Trust, all as hereinafter provided. Subject to the conditions and limitations set forth herein, the Trustee shall be responsible for the property received by it as Trustee, but shall not be responsible for the administration of any Plan or for those assets of the Plans which have not been delivered to and accepted by the Trustee. . . The Trustee shall not be responsible for the investment or reinvestment of the assets of the Master Trust, which investment and reinvestment shall be the responsibility of the investment manager as delegated by the Administrator, as provided in Section 4 hereof, and if not so delegated, of the Administrator.

*See* App. Ex. 4 at 2 § 1. Finally, Section 4.E. of the Service Agreement reads:

E. PLAN ASSETS
Putnam has no obligation to monitor, control or in any way exercise any powers or discretion in the handling or disposition of any Plan assets, including the disposition of any funds, securities or other assets under the Plan. . . Trustee responsibilities are specified in the Trust. The Employer specifically intends that Putnam have no discretionary authority to determine the investment of the Trust assets.

*See* App. Ex. 5 § 4.E., App. Ex. 6 § 4.E.

## 2. **Whether Plaintiffs Sufficiently Allege Defendants' Fiduciary Status**

Plaintiffs can only establish that the Defendants breached fiduciary duties of loyalty and prudence if they *first* establish that each of the Defendants functioned as "fiduciaries" with respect to each of the Plaintiffs' various allegations. *See* 29 U.S.C. § 1002(21)(A) (defining "functional fiduciary"). Defendants argue, however, that because none of the conduct on which Plaintiffs base their Complaint was carried out by Defendants in their performance of a fiduciary function, they cannot be held liable under ERISA. *See* Certain Defs.' Motion to Dismiss at 33.

Defendants, relying on the foregoing Plan Documents, argue that because "fiduciary

36

status is not an all-or-nothing proposition under ERISA," where Defendant Cardinal, the

Committee Defendants, and the Director Defendants exercised no discretion in selecting,

communicating about, or monitoring the Plan assets, they were not Plan fiduciaries, and,

therefore, are not liable. *Id*. Further, looking beyond the Plan Documents, Defendants argue that

precedent establishes that "when an ERISA plan names a corporation as a fiduciary, the officers

who exercise discretion on behalf of that corporation are not fiduciaries within the meaning of

[ERISA] section 3(21)(A)(iii), unless it can be shown that these officers have *individual*

discretionary roles as to the plan administration." *See id*. (citing *Confer*, 952 F.2d at 37

(emphasis in original)); *Crowley*, 234 F. Supp. 2d at 229 (dismissing complaint where directors

exercised no discretion in selecting investment options, communicating with plan participants, or

managing plan assets).

Guided by its decision in *AEP* and ERISA's liberal definition of "fiduciary," at this stage

of the litigation, this Court declines to address Defendants' arguments that they are not

fiduciaries. In *AEP*, this Court, faced with similar facts and an identical argument by defendants

refused to dismiss that case. *See* 327 F. Supp. 2d 812. There, the plaintiffs, plan participants,

sued defendants AEP, AEPSC (an AEP subsidiary and the alleged sponsor and named fiduciary

of the Plan), and two directors of AEPSC under ERISA §§ 502(a)(2) and (3). *Id*. Each of the

*AEP* defendants argued that "none of the conduct complained of was done as a fiduciary, so

there [could] be no liability." *See id*. at 825. Further, they averred that "[p]laintiffs attempt[ed]

to create fiduciary status by relying on conclusory allegations, coupled with non-related ERISA

conduct, or arguing that because the Plan Participants perceived [defendants] as [fiduciaries, they

were]." This Court found that, considering the liberal definition of an ERISA fiduciary, "at this

early stage of litigation, Plaintiffs' allegations [were] sufficient to survive a motion to dismiss. .

." *Id*. at 826.

Consistent with its findings in *AEP*, in this case, this Court adheres to the view that fiduciary status is a "fact-intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss." *See AEP*, 327 F. Supp. 2d at 827; *Rankin v. Rots*, 278 F. Supp. 2d 853, 879 (E.D. Mich. 2003) ("[T]he manner in which each defendant, which are in the universe of possible decision makers, operated is for now something of a black box. To expect a plaintiff to be able to turn on the light and point to the particular individuals who exercised decision making authority is simply too much to require at this stage of the litigation."); *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 665 (E.D. Tex. 2004) ("It is typically premature to determine a defendant's fiduciary status at the motion to dismiss stage of the proceedings. . . under Federal Rule of Civil Procedure 8(a)'s notice pleading requirements, courts will typically have insufficient facts at the motion to dismiss stage from which to make the law/fact analysis necessary to determine functional or named fiduciary status."); *In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898, 907-09 (E.D. Mich. 2004) (holding fiduciary status could not be determined on a motion to dismiss). Therefore, dismissal is not warranted on any count based on Defendants' arguments that Plaintiffs have failed to set forth facts establishing that each Defendant qualified as a Plan fiduciary. The Court will now look at each Count of Plaintiffs' Complaint and consider Defendants' other arguments.

**3. Count I - Whether Defendant Cardinal, the Committee Defendants, the Director Defendants, and Defendant Putnam Breached their**

**Fiduciary Duties of Loyalty and Prudence**

In Count I, Plaintiffs allege that the Defendants breached the fiduciary duties of loyalty and prudence imposed by ERISA by continuing to offer Cardinal stock as an investment alternative under the Plan despite the fact that knew that the Company's stock price was artificially inflated. 29 U.S.C. § 1104(a)(1)(A)-(B). Count I specifies that, as fiduciaries, the Defendants were required to both investigate and monitor the Plan's investment, including its investment in Cardinal stock. Plaintiffs allege that, had Defendants done so, they would have discovered that Cardinal stock was no longer a good investment, and they would have been obligated to reassess the merits of allowing Plan participants to invest in it, eventually divesting the Plan of all of its Cardinal holdings. Count I also alleges that because Defendant Putnam knew that Cardinal had potential to be an imprudent investment, it was not entitled to follow the direction of the Plan fiduciaries to invest in Cardinal stock.

The Defendants counter that they had no discretion as to whether an investment in Cardinal stock should be offered to employees since the Plan documents advised Cardinal employees that one of their investment options was to invest in Cardinal stock.[24] They contend

_____

[24]The Defendants also argue that the Court must dismiss Count I because the participants exercised "exclusive control" over their investment decisions. *See* Certain Defs.' Motion to Dismiss at 2 ("Plan participants were free to pick from among a wide range of investment options. They could choose to invest, in any combination, in equity, stable value, fixed-income, international or balanced funds, or a Cardinal stock fund. Participants were allowed to (and did) construct portfolios to satisfy their own unique risk/reward preferences."). Under ERISA, where a participant exercises "independent control" over the assets in his account, a fiduciary cannot be liable for any loss that results from the participant's exercise of control. *See* 29 U.S.C. § 1104©(1). Courts have held, however, that this provision does not require dismissal of the claim because the existence of independent control is an affirmative defense, and, in any event, a question of fact. *See In re Worldcom, Inc.*, 263 F. Supp. 2d 745, 764 (S.D.N.Y. 2003). Most significantly, under regulations issued by the DOL, a participant's control over his investment decisions is "not independent" if a "plan fiduciary has concealed material non-public facts

that Plaintiffs' claims should be considered under the "abuse of discretion" standard applicable to ERISA plans found to be exempt from the statute's diversification requirements.

### a. The Applicability of the "Abuse of Discretion" Standard To This Case

In this case, the Plan qualifies as an EIAP under ERISA § 407(d)(3). The Plan meets the requirements of ERISA § 407(d)(3)(A)(i) because it is an individual account plan which is "a profit sharing, stock bonus, thrift, or savings plan." It satisfies ERISA § 407(d)(3)(B) because Section 8.05 of the Plan document explicitly provides for acquisition and holding of qualifying employer securities.[25] *See supra* Part IV.A.1.a.iv. Before analyzing each Count of the Complaint, therefore, the Court first must determine whether the Plan is exempt from ERISA's diversification requirements and subject to the more lenient abuse of discretion standard, or whether, in the alternative, it should be analyzed under the traditional prudent person standard.

Defendants argue that their decision to remain invested in Cardinal is reviewed under an abuse of discretion standard and that the Court must presume that a fiduciary's decision to remain invested in employer securities was reasonable. *See Kuper*, 66 F.3d at 1459. Plaintiffs, on the other hand, assert that Defendants' argument is inapplicable to the instant case because it is an "artificial inflation case,[26] not a failure to diversify case." *See* Pl.'s Opposition at 5.

---

regarding the investment from the participant" unless the disclosure would violate the law. 29 C.F.R. § 2550.404c-1(c)(2).

[25]"The Trustee is authorized to maintain the "<u>Employer Common Stock Fund</u>" as one of the Investment Funds. . . One of the purposes of the Plan is to provide the Participants with ownership interests in the Company." *See* App. Ex. A. § 8.05; App. Ex. B. § 8.05.

[26]They allege that Defendants breach their fiduciary duties by permitting the Plan to invest in the Fund and Cardinal stock because the prices of the Fund and stock shares were artificially inflated as a result of undisclosed material adverse information, *not* because they were not sufficiently diversified. Pl.'s Opposition at 5.

Defendants counter, however, that because the abuse of discretion standard defines a middle path, which reconciles plan fiduciaries' sometimes contradictory duties, the abuse of discretion standard applies regardless of Plaintiffs' decision to label their claim an "artificial inflation" claim. Certain Defs.' Reply at 2-3.  Further, they contend that *all* EIAPs, whether ESOPs or not, are treated the same for the purpose of a fiduciary duty analysis, urging this Court to conclude that all EIAPs are designed primarily for acquisition and holding of qualifying employer securities and not for the primary purpose of providing employee pension benefits.  *See id*. at 3-4. (emphasis added).

Relying on *Kuper*'s finding that employer stock plans are "not designed to guarantee retirement benefits and [that] they place employee retirement assets at a much greater risk than they typical diversified ERISA plan," Defendants argue that the *Kuper* abuse of discretion standard[27] applies to *all* EIAPs.  *Kuper*, 66 F.3d at 1457 (referencing 29 U.S.C. § 1104(a)(2) (creating an exception to the diversification requirement (and the prudence requirement to the extent it requires diversification) for EIAPS that invest in employer stock)).  They contend that, without a more deferential standard of review, the risks to EIAP fiduciaries would be intolerable; plans that expressly required the holding of company stock would become unworkable and would cease to exist, contrary to Congress' goal of encouraging employee ownership of company stock.  *See, e.g., Steinman*, 353 F.3d at 1105 ("If ESOPs had to be diversified they would fail in their purpose of encouraging employees' ownership of their employer stock.").  Moreover, Defendants argue that the *Kuper* considerations are applicable whenever a plan

---

[27]The "abuse of discretion" standard is also referred to as the "intermediate prudence" standard.

provides for investment in a company stock and a plaintiff claims an EIAP fiduciary should have departed from the plan's term, a situation identical to the one in this case.

To support their assertions, Defendants reference a number of cases, arguing that all of them unequivocally declared that EIAPs and ESOPs are exempt from ERISA's diversification requirement. *See In re Calpine Corp. ERISA Litig.*, 2005 WL 1431506, at *4-5 (N.D. Cal. Mar. 31, 2005) (finding that ERISA exempts fiduciaries of EIAPs from "certain requirements, including the duty to diversify and the duty of prudence to the extent it requires diversification"); *In re Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090 (9th Cir. 2004) (finding that ESOPs and SPBs are both EIAPs that are exempt from ERISA's diversification requirements); *In re Syncor ERISA Litig.*, 351 F. Supp. 2d 970, 974 n.2 (C.D. Cal. 2004) (finding that "an ESOP is an eligible individual account plan (EIAP)," which is therefore not subject to ERISA's diversification requirement); *Landgraf v. Columbia/HCA Healthcare Corp. of Am.*, 2000 WL 33726564, at *5 (M.D. Tenn. May 24, 2000) (adopting *Kuper*'s intermediate prudence analysis because "ESOPs . . . are eligible individual account plans [("EIAP"s)]" and "all EIAPs are exempt from the diversification requirement").

Nonetheless, Plaintiffs rely upon precedent that contradicts the foregoing cases, and it is clear that Courts have more than one view on the issue. *See JDS Uniphase Corp. ERISA Litig.*, 2005 WL 1662131 (N.D. Cal. July 14, 2005) (finding that where plaintiffs alleged that defendants breached their fiduciary duties because the company stock was – itself – an imprudent investment, not because defendants breached a duty to diversify, defendants were not exempt from their duty to diversify under ERISA § 404(a)(2)); *AEP*, 327 F. Supp. 2d at 828 (because "it is neither necessary nor appropriate for the Court, at this juncture, to make a

42

determination of whether the Plan or the Fund qualifies as an ESOP," the *Kuper* presumption of

prudence does not apply at the motion to dismiss stage of the litigation);[28] *Horn v. McQueen*, 215

F. Supp. 2d 867 (W.D. Ky. 2002)) (declining to apply the *Kuper* diversification exemption in the

case of an ESOP fiduciary accused of overpaying for employer securities); *Donovan v.*

*Cunningham*, 716 F.2d 1455 (5th Cir. 1983) (same).

LaLonde v. Textron, Inc, is very similar to the instant case.  *See* 369 F.3d at 1.  In

*LaLonde*, plaintiffs, participants in Textron's ESOP plan, claimed that Textron and the

executives who had administered the company's plan, breached their fiduciary duties under

ERISA by continuing to direct 50% of the employer contributions and 100% of employer

---

[28]Defendants devote a portion of their Motion to Dismiss to discussing their reasons why the Court should distinguish *AEP* from the case sub judice.  *See* 327 F. Supp. 2d at 828; Defs.' Motion to Dismiss at 18.  Defendants write, "although the Court expressed reservations about addressing the abuse of discretion standard on a motion to dismiss in *AEP*, many courts have treated it as a Rule 12(b)(6) issue: Does the complaint state facts that, if true, would prove that defendants abused their discretion by allowing the plan to invest in company stock?"  *See id.*; *Wright*, 360 F.3d at 1098 ("Though plaintiffs contend that the district court prematurely dismissed their claims at the motion to dismiss stage, plaintiffs' alleged facts effectively preclude a claim under *Moench*, eliminating the need for further discovery."); *Calpine*, 2005 WL 1431406, at *15 (dismissing claim for failure to prudently manage plan assets because "Plaintiff has not, and cannot allege facts demonstrating that Calpine's 'financial condition [wa]s seriously deteriorating' and therefore cannot rebut the presumption of prudence established by the intermediate prudence standard"); *Crowley*, 234 F. Supp. 2d at 227, 230 (where Corning's stock declined approximately 80%, "conclusory allegations [were] insufficient to show that following the ESOP portions of the Plan was imprudent under the circumstances," prompting dismissal under Rule 12(b)(6)); *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 794, 795 (W.D.N.C. 2003) (where the plan sponsor was a "solid, viable company, far from 'impending collapse,'" a stock price drop from $44.97 to less than $20 per share was insufficient to show abuse of discretion resulting in dismissal under 12(b)(6)).

Despite Defendants' arguments, *AEP*, a case decided very recently in this very court, specifically held that "requiring Plaintiffs to affirmatively plead facts overcoming the ESOP presumption violates Rule 8(a)'s notice pleading requirement."  *AEP*, 327 F. Supp. at 829. Although the Defendants have cited cases from *other jurisdictions* that have followed the *Kuper* presumption of reasonableness, as this Court did not adopt the reasoning of these other jurisdictions in the 2004 *AEP* case, it will not do so in this case either.

matching contributions in Textron stock when they knew, or had reason to know, that Textron

faced troubles that were certain to cause a decline in the value of its stock.  *See id*.  The

plaintiffs' complaint alleged, among other things, that Textron had artificially inflated the price

of its stock by concealing the company's internal problems that eventually led to both lost

earnings and a shareholder securities action.  *Id*.  The district court granted the defendants'

motion to dismiss and the court of appeals reversed.  *Id*.

The appellate court held that the plaintiffs' allegations that Textron had artificially

inflated its stock price by concealing the company's problems and their adverse effect on its

financial state satisfied both Federal Rule of Civil Procedure 8(a) and the notice requirement

under *Conley*.  *See* 335 U.S. at 47. 369 F.3d at 3.  With respect to the application of the *Moench,*

*Kuper,* and *Wright* cases, the court reasoned:

> [b]ecause the important and complex area of law implicated by plaintiffs' claims is
> neither mature nor uniform. . . we believe that we would run a very high risk of error
> were we to lay down a hard-and-fast rule. . . based only on the statute's text and history,
> the sparse pleadings, and the few and discordant judicial decisions discussing the issue
> we face.  Under the circumstances, further record development – and particularly input
> from those with expertise in the arcane area of the law where ERISA's ESOP provisions
> intersect with its fiduciary duty requirements – seems to us essential to a reasoned
> elaboration of what constitutes a breach of fiduciary duty in this context.

*Id*. at 6.

Recently, the *JDS* court adopted the above reasoning, denying defendants' motion to

dismiss in a factually similar situation.  *See JDS*, 2005 WL 1662131, at *8.  The court explained

that it found *LaLonde'*s reasoning persuasive and held that "[w]hether on a full development of

the record the evidence will sustain plaintiffs' allegations remains to be seen, but on this motion

to dismiss we must accept the well-pleaded allegations of the complaint as true."  *Id*.

Applying the reasoning in *Lalonde* and *JDS* to the instant case, the Court will examine

44

whether fiduciaries have breached their duties under the prudent person standard and the liberal

notice pleading requirements.[29, 30] Moreover, in so holding, like the courts in *LaLonde* and *JDS*,

this Court abstains from deciding whether *all* EIAPs are subject to a lower intermediate prudence

requirement.

---

[29]Defendants contend that *JDS* and *LaLonde* are "based on completely different circumstances from Plaintiffs' allegations here." Certain Defs.' Reply at 5. They write,

> [t]he [*JDS*] court determined that the complaint would have stated a claim even if the court had applied the abuse of discretion standard, distinguishing the allegations in that case from those in *Calpine*. 2005 WL 166213, at *7-8. The [*JDS*] plaintiffs alleged that the company's stock 'dropped drastically' from $145 per share to $5 per share, whereas, in *Calpine*, 'the record before the court disclosed that Calpine had steady revenue and profit, showing that it was a viable concern and not in the sort of deteriorating financial circumstances that must be pled to rebut the presumption of prudence." *Id*. at *1, 8 n. 5. Similarly, in *LaLonde*, the employer's earnings per share had dropped over 70% and its common stock "significantly underperformed in comparison to the market as a whole. . . and [the company's] peer group." *See* 369 F.3d at 3. Cardinal's stock performance is much more similar to the employer stock's performance in *Calpine* than that in *JDS* and *LaLonde*.

Defs.' Reply at 5. Looking at Defendants' arguments, it is true that Cardinal's stock price was more stable than those of the companies in *JDS* and *LaLonde*. Nonetheless, there is still no binding precedent showing that, because of the stock's stability, the intermediate prudence standard applies. Therefore, despite Defendants' arguments, the Court is inclined to side with the reasoning in *JDS* and *LaLonde*, especially in light of the case being at the motion to dismiss stage.

[30]The Defendants also argue that because "[n]either *Kuper* nor *Moench*. . . speak[s] of the abuse of discretion standard as an *evidentiary presumption* that applies only at trial or summary judgment," courts may consider it on a motion to dismiss. *See* Certain Defs.' Motion to Dismiss at 20. Plaintiffs, however, counter that "presumptions are 'evidentiary' by their nature" and that a "presumption imposes on the party against whom it is directed the burden of going forward with *evidence* to rebut or meet the presumption, but does not shift to such party the burden of proof. . ." *See* Pl.'s Opposition at 13-14 (referencing FED. R. EVID. 301 (emphasis added)). Thus, Plaintiffs argue that this Court should apply Rule 8(a), requiring Plaintiffs' Complaint to merely set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *See id*. This Court is persuaded by the reasoning of *AEP*, requiring Plaintiffs' Complaint to comply with liberal notice pleading standards. Moreover, the Court need not reach the highly technical corollary issue of whether the *Kuper* presumption is evidentiary in nature.

**b. Whether Plaintiffs Have Stated a Claim Under the "Prudent Person" Standard**

Other than arguing that the Plaintiffs' claim fails because Plaintiffs have not alleged that Defendants abused their discretion in offering Cardinal Stock as an investment alternative, Defendants have not provided any other arguments for why Count I of Plaintiffs' Complaint should be dismissed as to Defendant Cardinal or the Committee Defendants. Defendants do provide additional arguments for why Count I fails to state a claim against the Director Defendants and Defendant Putnam. The Court will now consider the merits of these arguments.

First, Defendants argue that the Complaint fails to allege that the Director Defendants breached their duties of prudence because they did not function as fiduciaries with respect to "selecting investments and communicating with participants." *See* Certain Defs.' Motion to Dismiss at 32. Because this Court has already established that, under *AEP*, it will not decide a defendant's fiduciary status on a motion to dismiss, Defendants' arguments are irrelevant. *See* 327 F. Supp. 2d at 825-27.

Second, in their Motion to Dismiss, Defendant Putnam argues that, as a "Directed Trustee," it is subject to a different standard from a traditional Plan fiduciary and that Plaintiffs have not stated a claim against Putnam under this standard. The Court will now consider Defendant Putnam's arguments.

In Count I, Plaintiffs allege that Defendant Putnam was a fiduciary of the Plan and that, "[u]nder the Plan, the Trust Agreement, and ERISA, Defendant Putnam was obligated to prevent or preclude Plan investment in Cardinal Health common stock while Cardinal Health common stock was not a prudent investment." *See* Complaint ¶¶ 77-91. Defendant Putnam, counters

that, according to the language of the Plan Documents, it was a "directed trustee,"[31] and, as such,

had no fiduciary duty related to "purchasing and holding Cardinal stock and allowing Plan

participants to buy and hold interests in the Stock Fund through their Plan accounts." Putnam's

Motion to Dismiss at 8. Consequently, before determining whether to grant Defendant Putnam's

Motion to Dismiss, the Court must determine whether Putnam qualifies as a Plan "fiduciary."

A party's duties as a "directed trustee" are prescribed by ERISA § 403(a), which

provides in pertinent part:

> [A]ll assets of an employee benefit plan shall be held in trust by one or more trustees. . .
> [T]he trustee . . . shall have exclusive authority and discretion to manage and control the
> assets of the plan, except to the extent that –
> (1) the plan expressly provides that the trustee. . . [is] subject to the direction of a named
> fiduciary who is not a trustee, in which case the *trustees shall be subject to proper
> directions* of such fiduciary which are made in accordance with the terms of the plan and
> *which are not contrary to this chapter*. . .

29 U.S.C. § 1103(a) (emphasis added). It follows, therefore, that a party's status as a "trustee,"

directed or otherwise, must be determined by reference to the Plan, the Trust Agreements, and

the Service Agreements. *See DiFelice*, 2005 WL 2386627 at *7; *Beddall v. State Street Bank &

Trust Co.*, 137 F.3d 12, 19-21 (1st Cir. 1998) ("The starting point for a reasoned analysis of the

Bank's fiduciary status is the Agreement."); *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54,

61 (4th Cir. 1992) ("The discretionary authority or responsibility which is pivotal to the statutory

---

[31]"Although not found in § 403(a) or elsewhere in the statute, the term "directed trustee"
is widely used in common parlance to describe a plan trustee where, as § 403(a) notes and as is
true here, 'the plan expressly provides that the trustee or trustees are subject to the direction of a
named fiduciary who is not a trustee.'" *See DiFelice v. U.S. Airways, Inc.*, 2005 WL 2386227
(E.D. Va. Sept. 27, 2005).

definition of 'fiduciary' is allocated by the plan documents themselves.").[32]

The Court finds that, read together, the Plan, the Trust Agreement, and the Service Agreements provide evidence that Defendant Putnam is a "directed trustee" with respect to decisions to include a given instrument option in the Plan. Thus, Section 8.05 of the Plan provides that the Plan Committee is a "named fiduciary" and that only the Committee has the authority to select the various investment options from which the participants may choose. While Section 1 of the Trust Agreement grants Putnam certain powers to effectuate investment decisions, these powers are expressly made subject to both the Plan and the Trust Agreement, providing that Putnam exercise its powers *only* at the direction of the Committee or the Plan participants. *See* App. Ex. 4 § 6 (emphasis added). Specifically, the Trust Agreement provides that the Committee shall direct Defendant Putnam to invest in investment funds of Cardinal's choosing and that Putnam "shall not be responsible for the investment manager as delegated by the Administrator as provided in Section 4 hereof, and if not so delegated, of the Administrator." *See id*. § 1. Clearly, with respect to the selection of Plan investment options, Defendant Putnam is bound by the terms of the Trust Agreement to follow the Committee's directions Committee

---

[32]Defendant Putnam has attached to its Motion to Dismiss a thorough Appendix that includes the following Plan Documents, all of which are incorporated by reference in the Complaint: (1) App. Ex. 1 - Cardinal Health Profit Sharing, Retirement and Savings Plan, Amended and Restated Effective as of July 1, 1998; (2) App. Ex. 2 - Cardinal Health Profit Sharing, Retirement and Savings Plan, Amended and Restated Effective as of July 1, 2002; (3) App. Ex. 3 - Cardinal Health, Inc. Profit Sharing and Retirement Savings Plan Trust Agreement (July 1, 1998); (4) App. Ex. 4 - The Master Trust Agreement for Retirement Plans of Cardinal Health (January 2, 2001); (5) App. Ex. 5 - Service Agreement for Cardinal Health, Inc. Profit Sharing and Retirement Savings Plan and Cardinal Health, Inc. Frozen Retirement Plan; (6) App. Ex. 6 - Master Service Agreement for the Qualified Retirement Plans of Cardinal Health, Inc. (As amended and restated effective July 1, 2002 originally effective July 1, 1998); (7) App. Ex. 7 - "Fitch Comments on Cardinal Health, Inc." FitchRatings: FitchResearch (Oct. 27, 2004).

and is, therefore, a "directed trustee" within the meaning of ERISA § 403(a). Significantly, other courts presented with essentially similar plans, trust agreements, and service agreements have reached the same conclusion. *See, e.g., Beddall*, 137 F.3d at 19-21 (finding a directed trustee relationship when the plan vested authority in a named fiduciary to direct the trustee); *Worldcom*, 354 F. Supp. 2d at 441-43 (same); *Koch v. Dwyer*, 1999 U.S. Dist. LEXIS 11101, at *21-32 (S.D.N.Y. July 22, 1999) (same); *DiFelice*, 2005 WL 2386227 at * 7-9 (same).

Plaintiff, in contrast, argues that when Section 8.05 of the Plan states that,"[t]he Committee and the Trustee shall establish *certain* investment funds," the use of the word "certain" does not necessarily refer to "a fund invested primarily or exclusively in Cardinal Health common stock." Pl.'s Opposition at 4. Further, Plaintiffs contend that when the Plan says that the "Trustee is *authorized* to maintain" the Fund, instead of that the "Trustee is *required* by the Plan" to maintain the Fund, it is clear that Defendant Putnam "had discretion to maintain the Fund as long as it deemed the fund prudent, and had the authority to terminate the Fund when it became imprudent." *Id*. at 5.

Nonetheless, Plaintiff's arguments fail. Plaintiffs place far more weight on § 8.05 of the Plan than the provision can bear, and, as such, attempt to infer a broad grant of discretionary investment authority from a few arguably "ambiguous" terms. Further, Plaintiffs base their conclusions on a single clause – "[t]he Committee and the Trustee shall establish *certain* investment funds." *See* Defs.' Ex. A. § 8.05; Defs.' Ex B § 8.05. Their reliance on this language omits other relevant language which both reflects the purely procedural nature of this authority and makes clear that ultimate discretion resides with someone other than Putnam.

49

In sum, the Plan, the Trust Agreement, and the Service Agreement,[33] taken together, make clear that Putnam is, in common parlance, a "directed trustee" subject to the directions of the Committee in regards to the selection of investment options for the Plan.  This conclusion does not, of course, end the analysis; instead, it begs the further question presented by Defendant Putnam's dismissal motion, i.e., whether Defendant Putnam, as a directed trustee, had a duty to challenge or remove Cardinal stock as one of the Plan participants' investment choices because it was artificially inflated by Cardinal's accounting misstatements.  If Defendant Putnam had no such duty to act, it cannot be held liable for failing to act in this regard.

Defendant Putnam's duties as a "directed trustee" are prescribed by ERISA § 403(a), which provides that where a trustee is "subject to the direction of a named fiduciary," then it must comply with the "proper directions" of such trustee which are made in accordance with the plan and which are not contrary to ERISA.  *See* 29 U.S.C. § 1103(a).  Further, because Defendant Putnam must comply with all the Committee's directions that are proper and not contrary to the Plan or ERISA, it follows that Defendant Putnam's liability is limited to instances in which it either fails to follow such proper direction or complies with directions that are contrary to either the Plan or ERISA.  Just as there can be no liability for a breach of duty where no duty exists, nor can Defendant Putnam incur liability for following the Committee's directions when they are proper and consistent with both the Plan and ERISA.  Indeed, Defendant Putnam had no discretion to do otherwise.  More particularly, the application of Section 403(a) in this case means that if the Committee's continuing direction to retain the Cardinal Stock Fund as a Plan investment option was proper and not contrary to the Plan or

---

[33]The Plan Documents are summarized in Part.IV.C.1.

ERISA, then Defendant Putnam was bound to follow that direction and may incur no liability for having done so.

According to *DiFelice*, a recent case discussing a directed trustee's fiduciary duties under the defendant company's Stock Fund plan, "[t]he question of whether . . . direction was 'proper' and not contrary to ERISA or the Plan is essentially a question of statutory interpretation requiring a sharp focus on ERISA § 403(a)'s plain language, as well as its structure and purpose. *See* 2005 WL 2386227, at *9.[34] This Court fully embraces the *DiFelice* analysis agreeing that, despite the many different definitions of "proper," "it seems clear that Congress, by requiring directions to be 'proper,' intended only to require that a direction from a named fiduciary conform to general formalities that identify a direction as valid or genuine," and that "[b]y requiring directions to be 'proper' in this sense, Congress meant to exclude from § 403(a) any communications from the named fiduciary that did not meet certain formal requirements, including that a direction be clear . . . and unequivocal and that it issue from a person or entity with authority to do so." *Id*. (citing THE AM. HERITAGE COLLEGE DICTIONARY 1096 (3d ed. 1993) (defining "proper" as "called for by rules or conventions")).[35] In this case,

_____

[34]Though Defendant Putnam cites the *DiFelice* case in its Reply Memorandum, the case was not cited in Defendant Putnam's Motion to Dismiss. *See* Putnam's Reply at 1. Consequently, Plaintiffs do not consider *DiFelice* in their Opposition. Upon further review, however, the Court agrees with Defendant Putnam that *DiFelice* sheds light on the issue of the fiduciary duties of a directed trustee. Thus, though it is not binding precedent, the Court relies heavily on its line of reasoning.

[35]The *DiFelice* court further explains that,

[c]onstruing 'proper' in this way gives the term a role to play in the application of § 403(a) that is independent from the role played by the phrase 'in accordance with the terms of the plan' and 'not contrary' to ERISA, which are the primary constraints on a directed trustee's conduct. By so doing, this construction honors the principle of

the Committee's direction to include the Stock Fund as a Plan investment option was "proper," and there is no contention to the contrary.

Still remaining is the question of whether this continuing direction was "contrary" to the Plan or ERISA, or put differently, whether, in light of Cardinal's falling stock price, Defendant Putnam was obligated through its duty of prudence to countermand the Committee's direction and remove the Cardinal Stock Fund as a Plan investment option, and whether failing to do so violated the Plan and ERISA. In *DiFelice*, the court found that the answer "lies in whether § 403(a) should be read as imposing on directed trustees an implicit duty of ordinary care and prudence to second guess the wisdom of the named fiduciary's directions as to Plan investment options." *See* 2005 WL 2386227, at *10. The court determined that "properly read, § 403(a) includes no such implicit duty of prudence," and that "[t]o conclude otherwise would effectively eviscerate § 403(a) by eliminating any distinction between the duty of a directed trustee under § 403(a) and the duty of the ERISA named fiduciary with investment authority, who has the duty of ordinary care and prudence prescribed by § 404(a)." *Id*.

The *DiFelice* court's interpretation also relies upon the DOL's recent Field Assistance Bulletin[36] discussing a directed trustee's duty under ERISA § 403(a)(1) when instructed to invest

_____

statutory construction that no term should be rendered superfluous, and that 'statutory language must be read in context because a phrase gathers meaning form the words around it.'

*See* 2005 WL 2386227, at *9 (referencing *DIRECTV Inc. v. Nicholas*, 403 F.3d 223, 225 (4th Cir. 2005) (quoting *Gen. Dynamics Land Sys. Inc. v. Cline*, 540 U.S. 581 (2004))).

[36]In *DiFelice*, the court noted, "[t]he DOL's interpretation of ERISA, while not binding here, is nonetheless entitled to deference depending upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *See* 2005

in publicly traded stock issued by the plan sponsor.  *See* Field Assistance Bulletin No. 2004-03, dated December 17, 2004 ("FAB").[37]  The FAB addresses two scenarios: where a directed trustee possesses material, non-public information about the sponsor, and where its only information is public.  Where a directed trustee possesses "material non-public information that is necessary for a prudent decision," it has a duty to inquire whether the named fiduciary knows of and has considered such information.  *See* FAB at 4.[38]  Further, though according to the DOL, directed trustees rarely have an obligation under ERISA to act on public information, "in limited, extraordinary circumstances, where there are clear and compelling public indicators, as evidenced by and 8-K filing with the Securities Exchange Commission (SEC), a bankruptcy

---

WL 2386227, at *12, n. 25 (citing *Skidmore v. Swift*, 323 U.S. 134 (1944)).  The *DiFelice* court also found that "*Skidmore* deference is especially appropriate 'where the regulatory scheme is highly detailed' and the agency 'can bring the benefit of specialized experience to bear on the subtle questions in a particular case.'. . . In the case of ERISA, the DOL's interpretation is especially worthy of deference.  ERISA. . . is a 'comprehensive and reticulated statute,'" and the "DOL possesses specialized experience that informs its interpretation of the statute, and like the Fair Labor Standards Act at issue in *Skidmore*. . . ERISA provides the government with parallel enforcement authority under ERISA § 409."  *See Id.*  "In addition, the reasoning supporting the DOL's interpretation is sound."  *See supra* note 39.

[37]The FAB is attached to Putnam's Motion to Dismiss as Ex. A.

[38]The FAB states:

The directed trustee's obligation to question market transactions involving publicly traded stock on prudence grounds is quite limited.  The primary circumstance in which such an obligation could arise is when the directed trustee possesses material non-public information regarding a security.  If a directed trustee has material non-public information that is necessary for a prudent decision, the directed trustee, prior to following a direction that would be affected by such information, has a duty to inquire abut the named fiduciary's knowledge and consideration of the information with respect to the direction.  For example, if a directed trustee has non-public information indicating that a company's public financial statements contain material misrepresentation trustee does not have to determine the properly directed.

*See* FAB at 4.

filing or similar public indicator, that call into serious question a company's viability as a going concern, the directed trustee may have a duty *not* to follow the named fiduciary's instruction without further inquiry." FAB at 6 (emphasis added).[39]

Plaintiffs, on the other hand, do not cite *DiFelice* in their Opposition. Instead, Plaintiffs rely heavily on *Worldcom*, *AOL*, and *In re Sprint Corp. ERISA Litig. See* 263 F. Supp. 2d 745; 2005 WL 563166, at *1; 388 F. Supp. 2d 1207 (D. Kan. 2004). They contend that because the courts in those cases denied directed trustees' motion to dismiss in similar situations, this Court should follow suit. *See* Pl.'s Opposition at 6-7. These cases are distinguishable from the case *sub judice*. First, both the *Worldcom* decision and the *Sprint* decision were issued "prior to the [drafting of the] FAB and thus did not consider the [DOL]'s views as to directed trustees," making them less reliable than the more recent *DiFelice* decision. *See* 263 F. Supp. 2d at 762; 388 F. Supp. 2d at 1207. Second, the *AOL* decision, differs from the instant case in that, while Putnam vehemently argues that it is *not* a fiduciary, Fidelity, AOL's directed trustee, actually *concedes* its fiduciary status.[40] *See* 2005 WL 563166, at *7 n. 9.

---

[39]The DOL bases its opinion on the following considerations: "(1) markets generally are assumed to be efficient so that stock prices reflect publicly available information and known risks; (2) in the case of employer securities, the securities laws impose substantial obligations on the company, its officers, and its accountants to state their financial records accurately; and (3) ERISA section 404 requires the instructing fiduciary to adhere to a stringent standard of care." FAB at 5. Furthermore, the DOL opines that "because stock prices fluctuate as a matter of course, even a steep drop in a stock's price would not, in and of itself, indicate that a named fiduciary's direction to purchase or hold such stock is imprudent and, therefore, not a proper direction." *Id*. Considering both *DiFelice* and the FAB, this Court is convinced that, though "directed trustees" still maintain the fiduciary duty to be a prudent investor, their duty is *significantly limited*.

[40]Defendant Putnam argues only secondarily that, if the Court determines that, as a directed trustee, it owes the Stock Plan a fiduciary duty of prudence, it should be a *limited* duty.

54

Considering the high threshold set by the FAB and *DiFelice* as to when a directed trustee must take some action, the Plaintiffs simply do not meet the requirements here. The first prong of the FAB analysis does not apply because there is no allegation that Putnam possessed any material, non-public information about Cardinal, least of all information that would be necessary for a "prudent" decision. Nor is the second test met. The Complaint makes no allegation of any clear and compelling public indicator calling into serious question Cardinal's viability as a going concern. The only public information of any type cited in the Complaint is the October 27, 2004 Fitch Report. *See* Complaint ¶ 85. This report, however, is insufficient to trigger a duty under the FAB, which expressly states that a directed trustee's duty is only triggered by public indicators similar to the issuer's own 8-K filing with the SEC or its bankruptcy filing – statements by the Company itself, and not outsiders' opinions. In fact, the FAB expressly states that no duty is triggered by analyses about corporate affairs or prospects.[41] *See* FAB at 6 n. 5 ("[a] directed trustee's actual knowledge of media or other public reports or analyses. . . does not, in and of itself, constitute knowledge of clear and compelling evidence"); *see also Worldcom*, 263 F. Supp. 2d 745 ("Analyst recommendations to sell WorldCom securities do not represent reliable information regarding the company's viability.").[42]

---

[41]Even if the Fitch Report were relevant under the DOL's standard, it does not call into serious question the Company's viability as a going concern. Fitch rated Cardinal as BBB+/F2, indicating that Cardinal's debt was believed to be investment grade. Further, the Fitch Report provides a number of observations precluding a likelihood of collapse. For instance, it states that the Company's "2005 cash flow should be strong" and that an upcoming scheduled earnings call to discuss first quarter 2005 results "preclud[ed] any need for bank extensions, thus alleviating short-term liquidity concerns." App. Ex. 7.

[42]Plaintiffs also point to the government's investigations of Cardinal and the Company's declining stock price, presumably as further indicia of imprudence. *See* Pl.'s Opposition at 10. These facts, however, are unavailing. First, the Complaint's bare assertion of an SEC inquiry

Those publicly filed statements by the Company that are to be considered under the DOL's guidance, the SEC filings, do not show that Cardinal was in danger of imminent collapse. The annual statement for the period ending June 30, 2004 shows that since 2000, Cardinal reported increasing year-over-year revenue, earnings and assets. *See* App. Ex. J at 26-27. Moreover, Cardinal reported positive earnings through the end of Putnam's tenure as Trustee in December 2004. *See id*. at 26. As to cash on hand, a reflection of a company's liquidity, Cardinal reported an increase from $544 million on December 31, 2003 to $1.27 billion on December 31, 2004. *See* Cardinal App. Ex. I at 5. These public indicators do not call into serious question Cardinal's viability as a going concern; indeed, they actually negate any inference of Cardinal's imminent collapse. Consequently, Section 403(a)'s text and context, the DOL's FAB, and the *DiFelice* decision all point to the conclusion that the information available to Putnam was insufficient to have triggered a duty to object to the direction to continue to include the Cardinal Stock Fund as an investment option in the Plan.

As a directed trustee, Defendant Putnam's primary duty was to follow the directions of the named fiduciary and of the plan participants, except in extraordinary circumstances not alleged in the Complaint. As an active fund manager, however, Defendant Putnam must decrease its holdings each time it thinks the odds the stock price will decline are greater than the

---

does not indicate whether Putnam *knew* of such inquiry, and, therefore, is irrelevant as to Putnam. Second, even if Putnam did know of the investigations, the DOL recognizes that "[n]othing in the [FAB] should be read to suggest that a directed trustee would have a heightened duty whenever a regulatory body opens an investigation of a company whose securities are the subject of a direction, merely based on the bare fact of the investigation." FAB at 6 n. 7. Finally, though Plaintiffs allege that the 5 percent drop in Cardinal's stock price over the course of the Class Period provides evidence of Putnam's imprudent investing, a drop in stock price alone is insufficient to ground a determination of imprudence. *See LaLonde*, 369 F. 3d at 7.

chances the stock price will increase.  "To conflate these two roles is to misunderstand [Defendant Putnam's] role as a directed trustee and to require [Putnam] to assume responsibilities it was not paid for and had not accepted."  *See DiFelice*, 2005 WL 2386227, at *16.  Consequently, the Court **GRANTS** Defendant Putnam's Motion to Dismiss **Count I**.

### 4. Count II- Whether Defendant Cardinal, the Committee Defendants, and the Director Defendants Breached Their Fiduciary Duties by Making Material Misrepresentations and/or by Failing to Disclose Material Information

As discussed above, in Count II, Plaintiffs assert that *all* Defendants except Putnam breached a fiduciary duty under ERISA § 404 by negligently misrepresenting and failing to disclose material information to Plan participants and by providing Plaintiffs with SPDs that omitted undisclosed materially adverse information.  *See* Complaint ¶¶ 92-101.  In response, Defendants contend that the allegations in the Complaint are too general to put any Defendant on notice of how he or she may have been acting in a fiduciary capacity or in what way he had purportedly breached his fiduciary duty.  *See* Certain Defs.' Motion to Dismiss at 29.

It is well-settled that "a fiduciary may not materially mislead those to whom the duties of loyalty and prudence described in 29 U.S.C. § 1103 are owed."  *See AEP*, 327 F. Supp. 2d at 831 (referencing *Berlin*, 858 F.2d at 1163).  To establish a claim for breach of fiduciary duty based on alleged misrepresentations, a plaintiff must show that: (1) defendant was acting in a fiduciary capacity when it made the challenged statements; (2) the statements constituted material misrepresentations; and (3) plaintiff relied on them to his/her detriment.  *See id*. at 832 (citing *Pirelli*, 305 F.3d at 449).  Other courts  have also deemed it unlawful for a fiduciary to miscommunicate affirmatively or to mislead plan participants about material matters regarding the plan.  *See id*. at 831; *see, e.g. Enron*, 284 F. Supp. 2d at 555.  Furthermore, in *Unisys* the

court held that "an ERISA fiduciary has a duty under section 1104(a) to convey complete and accurate information when it speaks to participants and beneficiaries regarding plan benefits." *See* 74 F.3d at 441. Subsequently, too, the Sixth Circuit stated, in *Pirelli*, that "with respect to the situation presented when an employer on its own initiative disseminates false and misleading information about a benefit plan, the position of the Sixth Circuit is aligned with that of the Third Circuit in *Unisys*." *See AEP*, 327 F. Supp. 2d at 831 (citing *Pirelli*, 305 F.3d at 455).

Defendants argue that Count II should be dismissed because, by relying on the fraud on the market (the "FOTM") theory, which courts only recognize in securities fraud cases, Plaintiffs have failed to sufficiently plead proximate causation (also called "loss causation"),[43] and because Plaintiffs have pled no facts to support the conclusory assertion that any of the Committee Defendants "should have known" that other unidentified people made mistakes in Cardinal's SEC filings. *See* Certain Defs.' Motion to Dismiss at 21-25.

### a. Loss Causation

The Court will first consider Defendants' arguments on the subject of "loss causation." Defendants offer that to state an ERISA claim based on a misrepresentation, a plaintiff must plead that he suffered actual damages caused by the defendant's fiduciary breach, and must show a "causal link" between the alleged breach and the harm suffered. *See id.*; *Kuper*, 66 F.3d at 1459-60 ("Proof [of] a causal connection. . . is required between a breach of fiduciary duty and the loss alleged"; finding that a fiduciary's failure to investigate an investment decision is *not* a sufficient causal link to the harm suffered by the plan). They assert that, where, as here, a

---

[43]*See Campbell v. Shearson/Amer. Express, Inc.*, 1987 WL 44742, at *2 (6th Cir. Sept. 9, 1987) (noting that the proximate cause requirement is also commonly referred to as "loss causation").

plaintiff's alleged damages flow from investing in a publicly-traded stock, *Dura Pharms., Inc. v. Broudo* instructs that merely asserting that a stock's price was "artificially inflated" at the time of the plaintiff's purchase is not adequate to allege that a misstatement caused loss to the plaintiff. *See id.*; 125 S. Ct. 1627, 1630-31 (2005). Plaintiffs counter that Defendants' "entire argument is based on the flawed premise that . . . *Dura* applies in the ERISA context." *See* Pl.'s Opposition at 14.

The threshold inquiry is the applicability of *Dura*. *See* 125 S. Ct. 1627. In *Dura*, plaintiffs represented a class of individuals who had bought stock in Dura Pharmaceuticals on the public market between April 15, 1997 and February 24, 1998. *Id.* at 1629. The plaintiffs alleged that, during the class period, Dura (or its officials) made false statements concerning its profits and prospects for future approval of its products by the Food and Drug Administration (FDA). *See id.* at 1627. On February 24, 1998, Dura disclosed to the market that its earnings would be slower than previously expected (principally due to slow drug sales), and Dura's stock shares lost almost half of their value, falling from $39 per share to $21 per share. *Id.* at 1630. Later, in November 1998, Dura announced that the FDA had decided *not* to approve its new product, prompting even more of a drop in the Company's stock price. *See id.* The *Dura* plaintiffs argued that, "[i]n reliance on the integrity of the market, [they] . . . paid artificially inflated prices for Dura securities and . . . suffered damage[s] thereby." *Id.* (quotations and emphasis omitted).

The Supreme Court concluded that this interpretation of loss causation, if applied, would do more harm than good. *Id.* at 1631. The Court reasoned that "at the moment the transaction takes place," the plaintiff must have suffered a loss to be able to establish loss causation in a

59

securities fraud causation claim.  *Id*.  The most that can be said is that a higher purchase price can *sometimes* contribute to bringing about a future loss.  *Id*. at 1632 (emphasis added).  Thus, *Dura* held that a plaintiff who merely alleges that a stock's inflated purchase price caused his loss will not withstand the PSLRA's pleading requirements.  *Id*.  The Court noted that, "[t]o 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires."  *See id*. (citing 15 U.S.C. § 78u-4(b)(4)).  The Court concluded, "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and [the] causal connection that the plaintiff has in mind.  At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about" the strike suits the statutes seek to avoid.  *See id*. at 1634.

Plaintiffs argue that the *Dura loss* causation rules do not apply here because "breach of fiduciary duty claims under ERISA are based on the law of trusts, not common law fraud."  *See* Pl.'s Opposition at 17; *see, e.g. Varity Corp.*, 516 U.S. at 496.  They assert that not only do pleadings rules based on the law of fraud "not translate well into the ERISA context" but also that Defendants "fail to cite any authority for the proposition that *Dura* applies in an ERISA case."  *See* Pl's Opposition at 17.  Defendants, however, contend that "[i]t does not matter that *Dura* involved securities claims as opposed to claims under ERISA, because, to recover under ERISA just as under the securities laws, a plaintiff still must plead and prove the fundamental element of proximate causation. . . Did the defendant's alleged nondisclosure proximately cause the actual loss to the plaintiff?"  *See* Certain Defs.' Motion to Dismiss at 24-25.

Tellingly, Defendants fail to cite any authority that *Dura* applies in an ERISA case or to provide any authority for the proposition that federal courts have applied similar reasoning in

dismissing ERISA claims on causation grounds' hold nothing of the sort. For instance, many of the decisions upon which Defendants rely were decided on summary judgment motions; therefore, the courts had a more developed record on which to base their decisions than they would have had on a motion to dismiss. *See Kuper*, 66 F.3d at 1459; *Henry v. Champlain Enterps.*, 288 F. Supp. 2d 202, 230-32 (N.D.N.Y. 2003); *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 290-91 (3d Cir. 1995); *Armstrong v. Amsted Indus. Inc.*, 2004 WL 1745774, at *7 (N.D. Ill. July 30, 2004); *Tardiff v. Gen. Elec. Co.*, 2000 WL 33376644, at *9 (D. Conn. Sept. 30, 2000).

Furthermore, *Kane v. United Indep. Union Welfare Fund* and *Lewis v. Hermann*, two other cases on which Defendants rely, are easily distinguished from the case sub judice. *See* 1997 WL 411208 (E.D. Pa. July 22, 1997); 775 F. Supp. 1137 (N.D. Ill. 1991). First, unlike the present case, in *Kane*, the plaintiff's complaint conceded that there was no present injury to the fund, and pled only that there was a possibility of future injuries. 1997 WL 411208, at *2. Second, while the Court in *Lewis v. Hermann* did apply the securities law "loss causation" standard to an ERISA claim, the court pointedly noted that, while Defendants had *failed* to cite any "authority that loss causation is an essential element" of an ERISA claim, the plaintiff "effectively conceded" that it was, and accordingly, the court was willing to apply it as well. 775 F. Supp. at 1151.

In addition to the lack of applicable precedent supporting Defendants' position, the Court finds that pleadings rules based on the law of fraud do not translate well into the ERISA context. *See, e.g. Rankin*, 278 F. Supp. 2d at 865-66 (differences between fraud and breaches of fiduciary duty actions create lesser pleading standard for latter type of case). Though Defendants correctly

61

rely on *In re McKesson HBOC, Inc. ERISA Litig.* as dismissing a plaintiff's ERISA pleading

based in part on a theory that, by virtue of the securities laws, there was "no lawful action that

could have been taken by the fiduciaries that would have avoided the subsequent loss occurring

after public disclosure of the accounting problem" alleged by the plaintiffs, since then, other

courts have discredited similar theories.  2002 WL 31431588, at *8 (N.D. Cal. Sept. 30, 2000);

*see Gee v. UnumProvident Corp.*, 2005 WL 534873, at *12 (E.D. Tenn. Jan. 13, 2004)

(analyzing cases and finding an "evolving consensus" that the securities laws do not preclude

ERISA actions as suggested by the *McKesson* court)[44]; *see Rankin*, 278 F. Supp. 2d at 874.

Accordingly, the Court refuses to read into ERISA a requirement that Plaintiffs must plead "loss

causation" in accordance with the standard necessary for securities fraud claims.

### b. Whether Count II Fails to State a Claim for Relief By Failing to Show that the Committee Defendants had Any Knowledge of the Alleged Misstatements

After deciding that Count II of the Complaint cannot be dismissed for Plaintiffs' alleged

failure to plead "loss causation," this Court must consider Defendants' argument that Count II

fails to state a claim against the Committee Defendants because Plaintiffs have set forth "no facts

to support the conclusory assertion that any of the Committee Defendants 'should have known'

that other unidentified people made mistakes in Cardinal's SEC filings."  *See* Certain Defs.'

---

[44]Plaintiffs are correct that not only has *McKesson HBOC* been discredited, but it also dealt with an unusual fact pattern distinguishable from that in the case sub judice.  *See* Pl.'s Opposition at 18 n. 13 (citing 2002 WL 31431588, at *3).  In *McKesson HBOC*, the plaintiffs alleged that, as a result of a merger, stock was deposited into a plan that had already been tainted with fraud by the actions of non-fiduciaries.  2002 WL 31431588, at *3.  In this case, however, the improper accounting activities that allegedly caused Cardinal stock and the Fund to become "imprudent investments" occurred over a long period of time and on the Defendant fiduciaries' watch.

Motion to Dismiss at 29.

Defendants contend that courts should dismiss claims brought against administrative committees "where there [i]s no indication they knew about supposedly omitted information." *See Crowley*, 234 F. Supp. 2d at 230 (dismissing the claims against an ERISA planning committee because "all of plaintiff's causes against Committee members rest on the assumption that [the members] possessed the 'adverse information' outlined in the Amended Complaint. . . However, the Court repeats that the Amended Complaint makes no specific allegation that the Committee members actually possessed the 'adverse information'"); *Horvath v. Keystone Plan E., Inc.*, 333 F.3d 450, 461-62 (3d Cir. 2003) (only circumstances "known" to the plan fiduciary can give rise to an expanded fiduciary duty to disclose information necessary to protect a participant); *Hull v. Policy Mgmt. Sys. Corp.*, 2001 WL 1836286, at *9 (D.S.C. Feb. 9, 2001) ("Quite critically, plaintiff does not allege that the committee defendants themselves had any actual knowledge of any misinformation or that they participated in the dissemination of information they knew or should have known was misleading.").   Further, Defendants argue that "the Complaint also does not include any facts capable of explaining how an investigation by the Committee would have revealed the truth underlying the alleged errors in the SEC filings."  *See* Certain Defs.' Motion to Dismiss at 32 (citing *Kuper*, 66 F.3d at 1460 (failure to fulfill an investigatory response is not a breach unless an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident).

Plaintiffs retort that ERISA demands that fiduciaries conveying information to plan participants have a duty to convey complete and accurate information, and that when fiduciaries incorporate SEC filings by reference in communications to plan participants, they have a duty to

investigate to determine whether the information that they are incorporating is accurate. *See id*. Plaintiffs argue that because the Complaint alleges that the Committee Defendants – Miller, Adloff, Williams, Brandin, Rucci, Bennett, Watkins, and Nelson – all held "senior positions" with Cardinal, through those positions, they "should have known about the undisclosed adverse information set out in the Complaint." *See* Complaint ¶ 22; Pl's Opposition at 28.[45]

In *AEP*, this Court found that where Defendants chose to "incorporate AEP's SEC filings into the SPD, the SEC filings became fiduciary communications." *See* 327 F. Supp. at 825. Further, though the defendants in *AEP* argued that they had no duty to investigate these SEC filings, this Court explained that, "once one who is acting in a fiduciary capacity endeavors to discuss the plan, he may 'not affirmatively miscommunicate or mislead plan participants about material matters regarding their ERISA plan.'" *See* 327 F. Supp. 2d at 832 (citing *In re Xcel Energy, Inc., Secs., Derivative, & "ERISA" Litig.*, 312 F. Supp. 2d 1165, 1176 (D. Minn. 2004)). Thus, as it did in *AEP*, this Court finds that because the law regarding a fiduciary's duty of disclosure is "both controversial and evolving" the issue is not appropriate for a motion to dismiss. *See id*. (citing *Xcel Energy*, 312 F. Supp. 2d at 1182 ("[T]he issue is more amenable to

---

[45]Though Plaintiffs do not list the title and offices of the each Committee Defendant in the original Complaint, in their Opposition, they maintain that "all are or were senior officers of the company, holding the following positions: Defendant Adloff (Senior Vice President, Finance); Defendant Williams (Executive Vice President, Chief Legal Officer and Secretary); Defendant Brandin (Senior Vice President and Treasurer); Defendant Rucci (Executive Vice President, Human Resources); Defendant Bennett (Executive Vice President, General Counsel and Secretary); Defendant Watkins (Senior Vice President, Human Relations). *See* Pl's Opposition at 28 n.24. Further, without filing a formal request to amend the Complaint, Plaintiffs write "[i]f the Court believes that these additional facts are significant, the Complaint can be amended to include them." The Court finds these facts to be significant. Nonetheless, the Court is not persuaded that Plaintiffs' failure to provide them in the Complaint is detrimental to their claim.

resolution on a motion for summary judgment after discovery has shed further light on the facts and circumstances of the case."). Accordingly, the Court **DENIES** the Committee Defendants' Motions to Dismiss **Count II**.

### c. Actual Reliance

Next, Defendants posit that because, in Count II, Plaintiffs failed to plead actual reliance on any specific alleged misstatements, Count II fails as a matter of law. Defs.' Motion to Dismiss at 25-28. Defendants argue that the Complaint does not allege that any of the Plaintiffs were privy to any specific incorrect Company filing, or that they *relied* on a particular item of supposed misinformation in a Company filing. *Id*. at 26. Further, they contend that "[t]he Complaint tries to tiptoe around the reliance requirement. . . ambiguously saying that 'Plaintiffs, the Plan and the participants relied upon, *and are presumed to have relied upon* the representations and nondisclosures. . . to their detriment." *See* Complaint ¶ 96 (emphasis added). In effect, Defendants imply that the "fraud on the market" ("FOTM") presumption does not apply in the context of an ERISA action.[46]

---

[46]According to the "FOTM" theory, a plaintiff claiming securities fraud under § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder is entitled to a rebuttable presumption of reliance based on the notion that "in an open and developed securities market, the price of a company's stock is determined by the available material information." *See Securities Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 72 n. 5 (citing *Basic v. Levinson*, 485 U.S. at 241 (1988)) (internal quotation marks omitted). Consequently, "[m]isleading statements will. . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id*. (citing *Basic*, 485 U.S. at 241-42). The Plaintiffs seek to invoke FOTM for a presumption of reliance in this case.

Furthermore, some courts recognize a theory of "fraud on the regulatory process," an extension of the FOTM theory applicable in the federal securities context. *See BDO Seidman*, 222 F.3d at 72. Fraud on the regulatory process rests on the notion that in making investment decisions, an investor "relies, at least indirectly, on the integrity of the regulatory process and the truth of any representations made to the appropriate agencies and investors." *Id*. (referencing *In re Towers Fin. Corp. Noteholders Litig.*, 1995 WL 571888, at *23 (S.D.N.Y. Sept. 20, 1995);

Plaintiffs, on the other hand, argue that in these types of non-disclosure cases, the FOTM theory applies, allowing Plaintiffs to depend on the integrity of the market in relying on Defendants to prudently invest in the Plan on their behalf. Further, Plaintiffs allege that Defendants have not cited any precedent that considers "actual reliance" to be an ERISA § 502(a)(2) pleading requirement, and that, in *AEP*, this Court denied Defendants' motion to dismiss in an almost identical situation.

To date, no appellate courts have declared that the FOTM theory applies outside the context of securities fraud.[47] Further, in *AEP*, this Court determined that plaintiffs had adequately pled reliance without ruling on the applicability of FOTM theory to ERISA. *See* 327 F. Supp. 2d at 833. In *AEP*, the language the plaintiffs used to plead reliance was identical to that used by Plaintiffs in the instant case. *Id*.; Complaint ¶ 26 (emphasis added) (stating: "[t]he Plan, and the Participants acting on behalf of the Plan, relied upon, *and are presumed to have relied upon*, Defendants' representations and nondisclosures to their detriment"). In *AEP*, this

---

*Mishkin v. Peat, Marwick, Mitchell & Co.*, 658 F. Supp. 271, 274-75 (S.D.N.Y. 1987) (applying fraud on the regulatory process theory to presume reliance by a securities broker-dealer's investors)).

[47]Defendants contend that "nearly a year after the court in *AEP* declined to decide whether the FOTM presumption of reliance is applicable in ERISA cases, there is still no support for applying the presumption outside the context of Rule 10b-5." *See* Certain Defs.' Reply at 24. Plaintiffs, however, counter that "[d]efendants might equally have said. . . that nearly a year later no subsequent rulings have *denied* that the [FOTM] presumption applies in ERISA cases." *See* Pl.'s Opposition at 20-21. Defendants contend that Plaintiffs' assertions are incorrect because "in a stock-drop case similar to this one, the *EDS* court recently rejected the applicability of the theory in an ERISA context." *See* Certain Defs.' Reply at 24 (citing *In re Elec. Data Sys. Corp "ERISA" Litig.*, 305 F. Supp. 2d 658 (E.D. Tex. 2004). Despite Defendants' arguments, upon further review, the Court is not convinced that the *EDS* court declared the FOTM theory wholly inapplicable to ERISA cases. Therefore, though no court has applied the FOTM theory in an ERISA context, no court has *denied* its applicability either.

Court held that, under Rule 8, plaintiffs' complaint sufficiently pled reliance, especially where

other courts have found such allegations sufficient under even Rule 9(b)'s heightened pleading

requirements. *Id.* (citing *FRC Int'l, Inc. v. Taifun Feuerloschgeratebau und Vertriebs GmbH,*

2002 WL 31086104, *12 (N.D. Ohio Sept.4, 2002) (unpublished) (allegation that "Plaintiff

justifiably and actually did rely upon defendants' misrepresentations of fact, and defendants'

concealment and omissions of fact" was sufficient to prevent dismissal of RICO claim)).

Accordingly, as it did in *AEP*, in the case sub judice, the Court declines to decide whether the

FOTM presumption applies in an ERISA context, and finds that the issue of reliance is more

amenable to resolution on a motion for summary judgment or at trial, after discovery has

developed a complete evidentiary record. Plaintiffs have, therefore, pled reliance adequately to

withstand Defendants' various motions to dismiss.

### 5. Count III - Whether Plaintiffs Have Sufficiently Alleged that Defendant Cardinal, the Committee Defendants, and the Director Defendants Breached Their Fiduciary Duties to Monitor

As for Count III, Plaintiffs' allegations regarding failure to monitor, which Defendants

profess are insufficient, Plaintiffs aver in Complaint ¶ 104, *inter alia*, that:

> Director Defendants had a fiduciary duty to appoint as members of the Plan Committee
> persons with sufficient education, knowledge and experience to inform themselves as
> necessary to perform their duties as Plan Committee members, including the duty to
> evaluate the merits of investment options under the Plan, and had an ongoing fiduciary
> duty to ensure that the persons appointed to the Plan Committee were fully informed and
> performing their duties properly with respect to the selection of investment options under
> the Plan and the investment of the assets of the Plan.

Complaint ¶ 104.

This Court acknowledges that the ERISA statutory scheme imposes upon fiduciaries a

duty to monitor when they appoint other individuals to make decisions about the plan.  *Id.*  In

67

fact, according to 29 C.F.R. § 2509.75-8: "[a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfied the needs of the plan." Further, many courts have recognized the duty. *See, e.g. AEP*, 327 F. Supp. 2d at 832; *Xcel Energy*, 312 F. Supp. 2d at 1176 ("A person with discretionary authority to appoint, maintain and remove plan fiduciaries is himself deemed a fiduciary with respect to the exercise of that authority. Implicit in the fiduciary duties attaching to persons empowered to appoint and remove plan fiduciaries is the duty to monitor appointees. *Elec. Data Sys.*, 305 F. Supp. 2d at 670 ("ERISA law imposes a duty to monitor appointees on fiduciaries with appointment power.").

In *AEP*, considering almost identical allegations, this Court reasoned, that "[w]here the duty to monitor is irrefutable, and this litigation is still in its infancy, Plaintiffs' allegations are sufficient to meet the requirements of Rule 8(a), especially where further factual development cannot occur without discovery." *See* 327 F. Supp. 2d at 832-33; *see also CMS Energy*, 327 F. Supp. 2d at 916-17 (considering arguments by the defendants that the plaintiffs had failed to state a claim for duty to monitor, but deciding, "[b]y virtue of the status of [the] litigation, development of what fiduciary duties were delegated by defendants has not occurred," and thereby concluding that dismissal was not warranted). The same reasoning applies in this case, and the Court **DENIES** Defendants' Motion to Dismiss **Count III** as to the Committee Defendants, and the Director Defendants. Because Plaintiffs also apply the doctrine of *respondeat superior* specifically to argue that Cardinal Defendants are liable for a failure to monitor through the Director Defendants' alleged breaches, the Court must independently

examine the allegations that Cardinal Defendant failed to monitor the Plan's investments.

### a. Cardinal Defendant - Whether Cardinal May Be Liable for the Director Defendants' Actions Under *Respondeat Superior*

Plaintiffs invoke the doctrine of *respondeat superior*[48] in Count III to argue that Cardinal is liable for the Director Defendants' alleged failure to monitor the Committee. *See* Complaint ¶ 109.[49] Defendants argue, however, that Cardinal cannot be liable for the Directors' failure to monitor under the doctrine of *respondeat superior* because "there is no *respondeat superior* liability under ERISA." Certain Defs.' Motion to Dismiss at 38. On the other hand, Plaintiffs counter that "contrary to Defendants' arguments, *respondeat superior* makes perfect sense in an ERISA context." *See* Pl.'s Opposition at 30.

In their Motion to Dismiss, Defendants cite only one case in support of their argument that "there is no *respondeat superior* liability under ERISA." *See Tool v. Nat'l Employee Benefits Serv., Inc.*, 957 F. Supp. 1114, 1120-21 (N.D. Cal. 1996) (holding that *respondeat*

---

[48]"Under the doctrine of *respondeat superior*, an employer is liable, despite having no fault whatsoever, for the acts of its employees taken within the scope of their employment." *See Meyer v. Holley*, 123 S.Ct. 824 (2003) (finding that, ordinarily, principals or employers are vicariously liable for the acts of their agents or employees in the scope of their authority or employment).

[49]Plaintiffs write, "[t]he Company is liable for the Director Defendants' breaches of fiduciary duty in connection with the Director Defendants' failures to properly appoint, monitor and inform the fiduciaries whom they appointed under the doctrine of *respondeat superior*."*See Hamilton v. Carrell*, 243 F.3d 992, 1001 (6th Cir. 2001) (referencing *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998) ("[A] principal may be vicariously liable for an agent's torts under a *respondeat superior* theory. Under a *respondeat superior* rule, a principal is only held vicariously liable for torts committed by an agent when the agent acts for the benefit of his principal within the scope of his employment.")).

*superior* does not apply to ERISA fiduciary duty claim).  Plaintiffs concede that, though the

Sixth Circuit has yet to do so, other courts have recognized *respondeat superior* liability under

ERISA.  *See Am. Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assur.*

*Soc. of the U.S.*, 841 F.2d 658, 665 (5th Cir. 1988) (holding that non-fiduciary *respondeat*

*superior* liability attached under ERISA when the principal "actively and knowingly"

participated in the agent's breach); *Nat'l Football Scouting, Inc. v. Cont'l Assur. Co.,* 931 F.3d

646, 648-49 (10th Cir. 1991) (adopting the Fifth Circuit's finding that "in ERISA cases, the

doctrine of *respondeat superior* could impose liability on a principal for the misdeeds of his

agent"); *Stanton v. Shearson Lehman/Am. Express*, 631 F. Supp. 100, 104 (N.D. Ga. 1986)

(finding that brokerage firm could be subject to ERISA liability *both* on a *respondeat superior*

theory as well as on a "direct" fiduciary theory); *Crosley v. Composition Roofers' Union Local*

*30 Employees' Pension Plan*, 2005 WL 2405979, *7 (E.D. Penn. Sept. 29, 2005) (finding that

*respondeat superior* liability attaches in the ERISA context when an agent breaches his fiduciary

duty while acting in the course and scope of employment); *Kling v. Fidelity Mgmt. Trust Co.*,

323 F. Supp. 2d 132, 145-47 (D. Mass. 2004) (applying *respondeat superior* to ERISA breach of

fiduciary duty claim).  Nevertheless, the Sixth Circuit has yet to rule on the issue.  *See Hamilton*,

243 F.3d at 1001-03 (deciding not "reach the broader question of whether the doctrine of

*respondeat superior* applies in ERISA cases" and affirming the district court's judgment on this

ground).

     *Kling* is factually similar to the instant case, and offers a detailed discussion of the court's

reasoning in deciding to adopt *respondeat superior* for ERISA cases.  *See* 323 F. Supp. 2d at

145.  In *Kling*, Plaintiff, John Kling, an employee of Harnsichfeger Industries, Inc.

70

("Harnischfger"), sued Fidelity Management Trust Company ("Fidelity"), a number of individually-named Harnischfeger directors, officers, and employees, the Harnischfeger Industries Employee's Savings Plan ("Plan"), the Harnischfeger Industries, Inc. Pension and Investment Committee ("Investment Committee") and the Harnischfeger Industries, Inc. Board of Directors Pension Committee ("Pension Committee") for breach of fiduciary duty and prohibited transactions in violation of ERISA. *See id*. at 135. In addition to alleging fiduciary liability, and co-fiduciary liability, Plaintiff also alleged that Harnischfeger was liable for breaches by the Pension Committee, the Investment Committee, and all the Committee members under the "laws of agency, including the principals of vicarious liability and *respondeat superior*." *See id*. at 145. Though Defendants argued that the application of *respondeat superior* and vicarious liability in ERISA fiduciary duty cases "has been rejected as inconsistent with ERISA's functional concept of fiduciary responsibility," the court found that a claim may be stated under ERISA for *respondeat superior* liability. *See id*. at 147.

The *Kling* court reasoned that, though there was an obvious court split about whether *respondeat superior* had a place in an ERISA context, more cases argued *for it* than against it. *See id*.; *Nat'l Football*, 931 F.2d at 646; *McMahon v. McDowell*, 794 F.2d 100, 109 (3d Cir. 1986) (stating that employer could be liable if employees were found to have breached their duties); *Stuart Park Assoc. Ltd. P'Ship v. Ameritech Pension Trust*, 846 F. Supp. 701 (N.D. Ill. 1994) ("It is well-established that an employee's actions within the scope of employment are imputed to the employer, even in the context of ERISA litigation"); *Stanton*, 631 F. Supp. at 104 (commenting that "the broad protective purpose of ERISA" calls for *respondeat superior* liability); *Am. Fed.'n*, 999 F.2d at 665 (employer can be liable if "actively and knowingly

71

participating" in the employee's breach of a fiduciary duty).  Further, though the *Kling* court

agreed with defendants' arguments that "ERISA imposes a functional definition of fiduciary

status. . . [and] under the 'two hats' doctrine, courts have held that certain actions of an

employer. . . fall outside the scope of ERISA fiduciary duty," it also acknowledged that

"[d]efendants have failed to cite a single authority that evinces an intent within ERISA to

eliminate the vicarious liability of a corporation for the acts of its employees or agent."  *See id.* at

146 (citing *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)).  In this case,

adopting *Kling*'s line of reasoning, this Court finds that Plaintiffs' *respondeat superior* claim is

applicable to claims brought under ERISA.

       Accordingly, to make out a claim for Cardinal's *respondeat superior* liability, Plaintiffs

must show that the Director Defendants breached their duty to Plaintiffs while acting in the

course and scope of their employment.  *See Hamilton*, 243 F.3d at 1002.  In the Complaint,

Plaintiffs allege that,

> [t]he Director Defendants had a fiduciary duty to appoint as members of the Plan
> Committee persons with sufficient education, knowledge and experience to inform
> themselves as necessary to perform their duties as Plan Committee members, including
> the duty to evaluate the merits of investment options under the Plan, and had an ongoing
> fiduciary duty to ensure that the persons appointed to the Plan Committee were fully
> informed and performing their duties properly with respect to the selection of investment
> options under the Plan and the investment of the assets of the Plan.

*See* Complaint ¶ 104.  Then, to assert their claim of that Cardinal is liable for the Director

Defendants' failure to monitor under a theory of *respondeat superior*, Plaintiffs write, "[t]he

Company is liable for the Director Defendants' breaches of fiduciary duty in connection with the

Director Defendants' failures to properly appoint, monitor and inform the fiduciaries whom they

appointed under the doctrine of *respondeat superior*."  *Id*. ¶ 109.

Defendants argue that Plaintiffs' allegations fail to show that Director Defendants' breach of their duty to monitor occurred in the course of their employment with Cardinal. *See* Certain Defs.' Reply at 30. Defendants also contend that it does not make sense, under corporation law, to say that a company "controls" its directors. *See* Certain Defs.' Motion to Dismiss at 40 (citing *Arnold v. Soc'y for Sav. Bancorp*, 678 A.2d 533, 539-40 (Del. 1996) ("Directors, in the ordinary course of their service as directors, do not act as agents of the corporation. . . A board of directors, in fulfilling its fiduciary duty, controls the corporation, not *vice versa*.")); *see* OHIO REV. CODE § 1701.59(A) ("all of the authority of a corporation shall be exercised by or under the direction of its directors").

This Court is persuaded by the reasoning in *Woods v. S'ern Co.. See* 396 F. Supp. 2d 1351, 1373 (N.D. Ga. 2005). In *Woods*, plaintiff initiated a putative ERISA class action against her former employer, the Southern Company ("Southern"), as well as Southern Company Services, Inc. ("SCS"), the SCS Board of Directors (the "Director Defendants"), the Southern Company Employee Savings Plan Committee (the "ESP Committee"), and the Pension Fund Investment Review Committee (the "PFIRC"). *See id*. at 1356. The plaintiffs averred that SCS, a Southern subsidiary and the Plan's Sponsor, exercised responsibility for the management of the Plan's assets and the appointment of Plan fiduciaries, including the trustee. *Id*. The plaintiffs also alleged that defendant directors were responsible for the appointment, supervision and removal of other Plan fiduciaries, and were the actors through which SCS carried out its plan duties. *Id*. Defendants there argued that, "because the [c]omplaint does not allege that the SCS made any fiduciary appointments, only that the SCS Board of Directors did," SCS had no duty to monitor. *See id*. at 1373. The court found "this attempt to exempt a corporation from liability

73

for the acts of its Board [to be] ineffective." *Id*.  Though the court admitted its reluctance to impose ERISA liability under a theory of *respondeat superior*, it denied defendants' motion to dismiss the duty to monitor claim against SCS because it was "unable to find any support for the proposition that a meaningful distinction can be drawn between a corporation and the directors through whom it must act."  *See id*; *see also Enron*, 284 F. Supp. 2d at 660 ("as a matter of established law, a corporation acts through its board of directors to effectuate its corporate duties").  Accordingly, in this case, applying *Woods*, Plaintiffs' allegations that Cardinal may be held liable under a theory of *respondeat superior* are sufficient to withstand a motion to dismiss.  Consequently, this Court **DENIES** Defendant Cardinal's Motion to Dismiss **Count III**.

### 6. Co-Fiduciary Liability

Regarding the sufficiency of Plaintiffs' allegations of co-fiduciary liability, ERISA states:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to the plan shall be liable for breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

*See* 29 U.S.C. § 1105(a).

Defendants argue that Plaintiffs cannot state a claim for "co-fiduciary liability by lumping together the [twenty-five different] defendants into a wrongdoing monolith and making an undifferentiated assertion that each is responsible for all of the actions of all the others over a five-year period."  *See* Certain Defs.' Motion to Dismiss at 36.  Defendants posit that, "the basis

for the co-fiduciary claims in Count[s] I and II is the recitation that "[e]ach Defendant is liable for the acts of the other Defendant as a co-fiduciary." *Id.* (citing Complaint ¶¶ 90, 100). Defendants argue, therefore, that the Complaint does specify what each of them supposedly knew or concealed about the conduct of any of their co-Defendants, which is the necessary predicate for the co-fiduciary liability. *Id.* at 37. Conversely, Plaintiffs assert that Defendants "wrongly contend that Plaintiffs must plead the evidence that would be used to prove that claim." *See* Pl.'s Opposition at 29; *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 479-80 (S.D.N.Y. 2005) (complaint which "closely tracks the statutory language" is sufficient).

Considering the above arguments, this Court adheres to its position in *AEP*, in which this Court denied a motion to dismiss virtually identical allegations of co-fiduciary liability finding that Plaintiffs had "amply put [the] Defendants on notice." *See* 327 F. Supp. 2d at 833. As such, at this early stage of the litigation, the Court **GRANTS** Defendant Putnam's motion to dismiss Plaintiffs' co-fiduciary liability claims, but **DENIES** all other Defendants' motions to dismiss Plaintiffs' co-fiduciary liability claims.

## V. CONCLUSION

Based on the foregoing discussion, the Court **GRANTS** in part, and **DENIES** in part various Defendants' Motions to Dismiss. The Court **GRANTS** the following motions: (1) Defendants' Motions to Dismiss **Counts I, II,** and **III** brought under ERISA § 502(a)(3); and (2) Defendant Putnam's Motion to Dismiss **Count I**. The Court **DENIES** the following motions: (1) Defendant Cardinal's Motion to Dismiss **Counts I**, **II** and **III**; (2) Director Defendants' Motions to Dismiss **Counts I, II** and **II**; (3) Committee Defendants' Motion to Dismiss **Counts**

**I, II** and **III**[50]; and (4) Defendant Richard J. Miller's[51] Motion to Dismiss **Counts I**, **II** and **III**.

      **IT IS SO ORDERED.**


                                  **s/Algenon L. Marbley**
                             **ALGENON L. MARBLEY**
                             **UNITED STATES DISTRICT JUDGE**

**DATED: March 31, 2006**

---

[50]Though Committee Secretary, Susan J. Nelson, did not bring her *own* motion to dismiss the Complaint, in the motion to dismiss brought jointly by several Defendants, the Defendants specifically argue that the Complaint fails to allege that Ms. Nelson was a Plan fiduciary.  *See* Certain Defs.' Motion to Dismiss at 40-41.  Nonetheless, Ms. Nelson's position as the Committee Secretary, probably makes her privy to certain inside information.  At this stage of the litigation, therefore, the Court will allow the claim against Ms. Nelson to proceed to allow discovery on the issue of her status as a Plan fiduciary.

[51]In his Motion to Dismiss, Defendant Richard J. Miller joins the arguments of the Motion to Dismiss brought jointly by several Defendants.  Defendant Miller's separate argument is that the Court should dismiss all Counts pled against him because the Complaint "fails to provide any specific allegations to support the conclusory assertions that Mr. Miller knew or should have known that Cardinal's SEC filings contained erroneous financial information or otherwise omitted 'material adverse information.'" *See* Miller's Motion to Dismiss at 2.  Because Mr. Miller is one of the Committee Defendants, and because the Court has declined to grant the motion to dismiss brought by the Committee Defendants, at this stage of the litigation, this Court will allow all claims against Mr. Miller to proceed to allow discovery on the issue of his status as a Plan fiduciary.